# STATE v. ADRIAN O. SIMONSEN.

89 N. W. (2d) 910.

May 2, 1958—No. 37,373.

Larson, Loevinger, Lindquist, Freeman & Fraser and *Gerald E. Magnuson,* for appellant.

*Charles A. Sawyer,* City Attorney, and *Milton Gershin,* Assistant City Attorney, for respondent.

NELSON, JUSTICE.

This appeal is from an order denying defendant's motion for an amended finding of not guilty or for a new trial. Adrian O. Simonsen was found guilty of driving an automobile on the afternoon of May 31, 1957, while under the influence of intoxicating liquor. He was charged with violating Minneapolis City Charter and Ordinances (Perm. ed.) 9:1-303, which reads as follows:

"It is unlawful for any person who is a habitual user of narcotic drugs or any person who is under the influence of intoxicating liquor or narcotic drugs to drive or operate any vehicles within this city."

Defendant admits that he was driving and operating his 1957 Ford Ranch Wagon at the time of the accident which led to his arrest but denies that he was driving while under the influence of intoxicating liquor. Defendant is a diabetic and contends that at the time of the accident he was suffering from insulin shock.

He was employed as a printing salesman by the Paul Foss Printing Company at 718 North Washington Avenue, Minneapolis. He is 39 years of age and has been a diabetic for 5 years, regularly taking insulin each morning. The accident which led to his arrest on the afternoon of May 31, 1957, was preceded by the following occurrences.

On the morning of May 31, 1957, at approximately 7:45 a. m. he took 30 units of insulin, which apparently was the normal amount he took daily. He then left his home and arrived at his office at about 8:45 a. m., spending the entire morning at his office. Shortly before 12 o'clock noon he left his office with Arnold Heikenen for lunch at Michael's in Golden Valley. At Michael's he consumed part, not all, of one, single vodka martini before partaking of a lunch consisting of lobster tips, bread, and coffee. He left there at approximately 1:05 p. m. with Mr. Heikenen and returned to his office. Upon his return he worked with his superior, Paul Foss, and other people in the printing company until approximately 2 p. m., when he left to go to the Mutual Service Insurance Company at 1919 University Avenue, St. Paul. He arrived there at approximately 2:20 p. m. and had business conversations at the company offices with Russell Hofstad, Roy Landstrom, and a Mr. Bohling. He left the Mutual Service Insurance Company offices at 2:45 p. m. for the offices of the Occidental Life Insurance Company in the Pioneer Building at 4th and Robert Streets in St. Paul, where he met and transacted business with Peter Devine of that company. He did not feel well while at Mr. Devine's office and left at approximately 3:45 p. m. to return to the Foss offices in Minneapolis. He testified that when he left things became more and more confused and that he does not remember anything that occurred after having driven one or two blocks

until he waked up in the northside police station at 8 p. m. He said that when he awoke he was still confused but recalls going to the downtown jail. There he received food and was able to contact his wife and arrange for his release from the jail. The accident occurred about five blocks from the Foss Printing Company offices.

The record indicates that the defendant was asked about his drinking habits and whether he drank alcoholic beverages daily. His answer was "No, sir." He was asked how often he drank. His answer: "I probably have two drinks a month, if that. It's quite seldom."

Dr. Cortland O. Robinson, called as a witness in defendant's behalf, testified that he had treated defendant as a diabetic patient for the preceding 6 months and that in his opinion the cause of the intoxicated appearance and behavior of the defendant was insulin shock, a medical term describing a situation in which the sugar content in the blood is so low that the bodily organs are undernourished and consequently do not function properly. The doctor further stated that the personal emotions of a patient or a difference in the amount or type of food consumed on a particular day could be sufficient to cause the disparity in the sugar level of the diabetic and consequently result in insulin shock.

Mr. Arnold Heikenen, called as a witness for defendant, corroborated the defendant's testimony that the two had gone to lunch at Michael's restaurant and that defendant had consumed one-half to three-fourths of a vodka martini prior to partaking of his lunch but that his drinking at the time was limited to that amount.

Paul Foss, defendant's superior at the Foss Printing Company, testified that he worked with defendant on the afternoon of May 31 after defendant had returned from his noon lunch shortly after 1 o'clock. He said that he detected no alcoholic odor from the defendant even though defendant sat at Foss' desk and worked right next to him.

Russell Hofstad, who was employed at the Mutual Service Insurance Company, testified that the defendant visited him on business at approximately 2:20 or 2:30 p. m. on May 31, 1957; that he worked in very close proximity with the defendant on that afternoon as they sat side by side looking over printing proofs. He testified that he detected no odor of alcohol on defendant's breath.

Roy Landstrom, also employed by the Mutual Service Insurance

Company and called as a witness for defendant, testified that he saw defendant on the afternoon of May 31 when Mr. Hofstad was present and came in close contact with him; that he detected no odor of alcohol on defendant's breath; and that he thought defendant appeared quite normal.

Peter Devine testified that he had business conversations with the defendant on the afternoon of May 31; that defendant arrived at his offices about 3 p. m. and that thereafter they spent approximately 45 minutes working together reviewing printing layouts. Mr. Devine testified that he did not detect any odor of alcohol on defendant's breath. He testified, however, that after defendant had been there for 15 or 20 minutes he told Devine that he felt as though he was having some physical trouble and at that time told Mr. Devine that he was a diabetic. Mr. Devine said that after they had been working side by side about 20 to 25 minutes the defendant began to perspire; that some 25 to 30 minutes later the defendant was speaking incoherently; that he left his offices for Minneapolis at approximately 3:45 p. m., at which time he was perspiring heavily, seemed strange, and appeared to be confused. Mr. Devine testified that he was concerned at the time over defendant's welfare but thought that since the defendant knew of his diabetic condition he would be able to take care of himself.

The accident occurred in front of 1811 North Third Street May 31, 1957, at approximately 4:15 p. m. It is not disputed that the driving time from the Pioneer Building, St. Paul, to the vicinity of the accident scene would be approximately 25 to 30 minutes. Defendant drove his car into and collided with an automobile driven by Warren Sandberg, who was coming south on Third Street while defendant was driving north. Sandberg testified that after defendant's car crossed the intersection at Third and 18th it angled across Third Street and struck his car. Sandberg walked over to defendant's car and spoke to defendant, but defendant did not reply and just looked at him with a glassy stare. Sandberg went to the police station and returned with Officer Norman Hektner. Defendant refused to leave his car and Officer Hektner obtained the aid of another officer, Richard Stiras. The two of them then took defendant out of his car. Sandberg, who testified that he observed defendant standing and walking, said defendant was limp and did not

walk steadily. He did not, however, talk with defendant or hear the defendant say anything. He did not observe defendant's eyes or face and did not smell defendant's breath.

Officer Norman Hektner, testifying for the state, said that he first saw the defendant sitting behind the wheel of his car, gripping the wheel with head bowed; that he, Hektner, obtained the services of Officer Stiras to assist in taking defendant out of his car; that defendant resisted but that they were able, with some difficulty, to get him out of the car. Hektner says that defendant staggered when walking and that his face was flushed; that Hektner offered to provide a drunkometer test but defendant refused. Hektner testified that he smelled alcohol on defendant's breath; that defendant's eyes were practically shut; that his speech was unsteady and incoherent, but this statement of Hektner was somewhat contrary to his testimony on cross-examination that defendant's inquiry as to his money and a billfold did not indicate incoherency. Hektner stated, however, that Officer Stiras assisted the defendant into the police station and that it was almost necessary to carry him.

Officer Richard Stiras, when called by the state, testified that when the defendant was standing by himself he wavered a little bit and that he staggered; that he assisted defendant into the station by holding his left forearm; that he smelled alcohol on defendant's breath. He also testified that defendant's eyes were half closed and bloodshot. He says he did not hear him speak except what he described as some mumble by defendant about money. Stiras says that the defendant was still staggering when he was taken downtown to the city hall.

William Herkal testified for the state. He was the police officer in charge of the station where Hektner and Stiras brought defendant following the accident. Herkal states that defendant did not walk unless assisted by some officer and that he staggered as he walked; that he appeared sleepy and his eyes were half closed. Herkal says he did not smell an odor of alcohol on defendant's breath; that he spoke to defendant when he was being released to be taken downtown; and that at that time defendant spoke coherently and there was at the time some conversation as to defendant's diabetic condition. It was 8:30 p. m. when defendant was taken downtown following the arrest. Herkal states that while the defendant was in the northside station he was sleeping. He

though that the defendant walked fairly normally when he left the station.

Defendant contends that the court below committed error in the following respects: (1) In denying defendant's motion for amended findings of fact to include a finding of not guilty upon the grounds that the finding of guilty was not sustained by the evidence; (2) in denying defendant's motion for a new trial on the ground that it had disregarded direct, positive, and unimpeached evidence adduced by defendant and his witnesses; (3) in permitting the introduction in evidence of defendant's refusal to take a test to determine the alcoholic content in his blood; (4) in allowing as evidence a nonexpert opinion on defendant's alleged intoxication when the foundation for such opinion was insufficient and inadequate; (5) in allowing as evidence a conclusion of a lay witness concerning ability to determine whether or not a person is intoxicated.

Defendant contends that his testimony is corroborated by unimpeached testimony in every important material respect. He argues that the witnesses who appeared in his behalf were in his company for a period of approximately 7½ hours preceding his arrest and corroborated his testimony in every detail as to what occurred during that period; that these witnesses were not members of his family, but persons who had no personal interest in the outcome of the action; that they were all business acquaintances and as such completely disinterested and impartial. It is pointed out that the person with whom the defendant spent the last 45 minutes before leaving downtown St. Paul for his Minneapolis office vividly described what he observed as to changes in defendant's demeanor, appearance, and physical condition, resulting in defendant advising him before leaving the office of his diabetic condition. The witness had seen the defendant only once in the 5-year period preceding the incident of that afternoon, an incident which so impressed him that he became concerned about the welfare of defendant and his driving back to Minneapolis.

The state takes the position that whatever facts and circumstances defendant's testimony and that of his corroborating witnesses may tend to prove the state's evidence nevertheless overwhelmingly establishes that the defendant had alcoholic odor on his breath at the time he was

arrested. The issue thus drawn becomes important. Considering the record as a whole, can it be said that the state's assumption is valid? The fact that not one of the defendant's witnesses detected an alcoholic odor, although they were all in close proximity to the defendant during the period of time covered by their testimony, when considered beside the testimony of the state's witnesses, of whom only two of the four who testified detected an alcoholic odor even though every one of them had an opportunity to make such detection, seriously challenges the state's claim that it has sustained the required burden of proof. In this connection it is well to consider the following testimony of the defendant's doctor on this fact:

"Q. Is it possible to have some kind of an odor on the breath of a person who is in insulin shock?

"A. That varies tremendously. They may have—if they have some transient acetone or diacetic acid in their blood, they may have—from the acetone a sweetish odor. If anybody smelled acetic acid, it's kind of a sour odor.

"Q. Could it be a combination?

"A. It could be a combination, but I must emphasize quite frequently the odors smelled are odors coming from the gastrointestinal tract or from the respiratory tract. It's bizarre."

Dr. Robinson pointed out in his testimony that persons suffering from insulin shock become antagonistic and negativistic in their attitude and that this constitutes one of the clear symptoms of insulin shock. Every doctor knows, and most lay persons who have experienced a diabetic in the family know, that the one who suffers from the disease is often plagued by the peril of the blood-sugar level going too low as a result of insulin shots. If insulin shock sets in, the diabetic becomes giddy, confused, and faces the probability of a complete blackout. It is known, as the evidence discloses, that the victim can counteract such shocks with candy or sugar if they are within reach and the victim is still able to sense the necessity for its immediate use. The state itself appears to have presented important evidence of the defendant's confused and disoriented condition, centering on his bloodshot and half-closed eyes and antagonistic attitude, in its attempt to show that he was

in fact in an intoxicated condition. Thus it shared in part in the position taken by the defendant to prove nonintoxication in order to prove defendant's intoxication. The state argues that the defendant made no request for sweets even after reaching the station in order to furnish such assistance in bringing him out of insulin shock. That argument is not convincing in the face of defendant's testimony that he has no recollection of anything that occurred between the time shortly after he left downtown St. Paul and the time several hours later when he awoke in the northside station. The evidence on the part of the officer in charge of the station to which he was taken is to the effect that there was no alcoholic odor and that he slept practically all the time until he was taken downtown at 8:30 p. m.

While the state contends that defendant had ample opportunity to obtain liquor between the time he left downtown St. Paul and the time he arrived at the scene of the accident, the evidence is undisputed that the defendant left downtown St. Paul approximately 25 to 30 minutes before the accident occurred and that 25 to 30 minutes is the driving time between those points.

■ The testimony of defendant and his witnesses is impressive and forcefully suggests, directly and by strong inference, that he was not under the influence of intoxicants at the time of the accident but rather that he had become the victim of insulin shock. The only expert opinion offered concerning the defendant's actual condition at the time of the arrest was by defendant's doctor who was familiar with the effects of insulin shock and with his condition for 6 months preceding the time of the accident. It was Dr. Robinson's expert opinion, based upon the evidence submitted, that defendant was not under the influence of intoxicating liquor but was suffering from insulin shock. Positive testimony of unimpeached witnesses cannot be disregarded when there is no real basis in the evidence for a finding that such evidence is either improbable or inconsistent. We recently said in Peterson v. Truelson, 249 Minn. 530, 536, 83 N. W. (2d) 236, 240, that:

"The jury may not be permitted to disregard all the positive, unimpeached evidence in the case and draw an inference contrary to all such evidence based on the mere supposition that possibly the motorman

may have had in his mind an intention to stop the streetcar to permit the pedestrian to board it. To permit the jury to do so is to allow it to draw an inference based entirely upon conjecture, supported by neither testimony nor circumstantial evidence." See, also, O'Leary v. Wangensteen, 175 Minn. 368, 221 N. W. 430.

That comment applies just as forcefully to the uncontradicted testimony of the defendant and his witnesses in the instant case.

There is no satisfactory basis in the record for finding that defendant's testimony was either improbable or inconsistent. Consequently viewing the evidence as a whole, the only plausible explanation for the incident leading up to the accident and to the arrest of the defendant was supplied by the defendant and his witnesses.

■ Since two of the state's witnesses detected no alcoholic odor on defendant's breath and thereby subjecting the state's evidence to inconsistencies, defendant's contention that he was suffering from insulin shock at the time of the arrest becomes at least equally consistent with the state's claim of defendant's intoxication; and even though the state may choose to ignore defendant's thoroughly corroborated evidence regarding his activities throughout the day in question, it may nevertheless be argued with considerable force and effect that the state has not sustained its burden of proof since evidence which is equally consistent with two possible theories or hypotheses tends to prove neither one. See, P. F. Collier & Son Co. v. Hartfeil (8 Cir.) 72 F. (2d) 625.

■ It is recognized generally that, since the lower court is the trier of fact, its findings on disputed fact questions are entitled to the same weight as a jury verdict and will not be upset merely because this court may view the evidence differently.

Not all of the state's witnesses agree that there was any alcoholic odor emanating from defendant's breath when arrested or later. Mr. Sandberg the driver of the other car testified unequivocally that there was no odor of alcohol, and Sergeant Herkal of the northside police station, who was with defendant during the full 4-hour period of incarceration, testified that he detected no odor of alcohol on defendant's breath. The state's testimony as to the detection of alcoholic odor comes, only, from two of its four witnesses who were questioned on that

issue, Officers Hektner and Stiras. All four had the opportunity to detect alcoholic odor if there was any. The outcome in the case does not center on simply believing one side or the other. The facts about defendant being a diabetic and a daily user of insulin are undisputed. The facts about the claimed involvement of liquor are decidedly speculative and conjectural, while defendant's testimony is thoroughly corroborated by other witnesses and it has not been impeached.

4. In view of the inconsistent and speculative character of the testimony upon which the state relies, we think, based upon the record as a whole, it is patently insufficient as proof of defendant's guilt. This court in State v. Oelschlager, 212 Minn. 485, 487, 4 N. W. (2d) 102, 103, where a conviction for violation of an ordinance regulating the sale of intoxicating beverages was involved, made it clear that it would not sanction a conviction grounded on evidence patently insufficient, stating:

"Although it is true that a violation of municipal ordinance need not be proved beyond reasonable doubt * * *, certainly this court cannot sanction a conviction grounded in evidence so patently insufficient. When prosecutions must be based upon evidence inherently so infirm, it would seem to indicate that law enforcement officers have extreme difficulty in finding satisfactory evidence of liquor violations. However, this court is not so easily beguiled into believing that violations cannot be discovered and proved by evidence which not only meets, but far exceeds, the persuasive quality required to support a conviction."

■ Another issue involves the admissibility of the evidence as to defendant's refusal to submit to a drunkometer test. Defendant contends that such evidence was inadmissible by virtue of Minneapolis City Charter and Ordinances (Perm. ed.) 9:1-304.5, which reads as follows:

"The refusal of the defendant to permit a chemical analysis to be made of his blood, breath, urine, or other bodily substance at the time of his arrest shall not be admissible in evidence against him upon trial."

It is undisputed that the said ordinance was in effect at the time of defendant's arrest. It is also undisputed that it has never been repealed and that it has not been declared invalid or unconstitutional by any

court.[1] It is plainly evident from the reading of the aforesaid sections of the ordinance and M. S. A. 169.121, subd. 2, that there is no conflict and no inconsistency between the state statute and the Minneapolis ordinance which prohibits evidence of a refusal to take such test. Section 169.03 provides that "Local authorities may adopt traffic regulations which are not in conflict with the provisions of this chapter." See, City of Duluth v. Evans, 158 Minn. 450, 197 N. W. 737; State v. Harris, 50 Minn. 128, 52 N. W. 387. This court has held that city ordinances, within their scope, have the force and effect of law.[2]

The evidence in this case fairly permits the inference that because of insulin shock and its well-defined effects from which the defendant was suffering at the scene of the accident and later he was unable normally to perceive the opportunity to clear himself by taking the drunkometer

---

[1]See Minneapolis City Charter and Ordinances (Perm. ed.) 9:1-304, which provides:

"Whenever any person driving or operating a motor vehicle shall be arrested and charged with driving or operating said vehicle while under the influence of intoxicating liquor, the officer or person making the arrest may, with the consent of the arrested person, cause a chemical analysis to be made of the blood, breath, urine or other bodily substance of the arrested person in order to determine the amount of alcohol then in such person's blood, and in the event of prosecution for said violation, the amount of alcohol found in defendant's blood, at the time of his arrest, as shown by the chemical analysis as aforesaid, shall give rise to the following presumptions." Following paragraphs relate to scientific measurement of alcohol in the blood.

See M. S. A. 169.121, subd. 2, which contains the following provisions:

"Upon the trial of any prosecution arising out of acts alleged to have been committed by any person arrested for driving, operating, or in actual physical control of a motor vehicle while under the influence of an alcoholic beverage, the court may admit evidence of the amount of alcohol in the person's blood taken voluntarily within two hours of the time of the offense as shown by a medical or chemical analysis of his breath, blood, urine or saliva." The balance of this statute deals with scientific methods of measuring alcoholic content of the blood and with appropriate punishment upon conviction.

[2]See, State v. Ritschel, 220 Minn. 578, 20 N. W. (2d) 673, 168 A. L. R. 274; Mayes v. Byers, 214 Minn. 54, 7 N. W. (2d) 403, 144 A. L. R. 821.

test offered and even has no recollection of ever being offered the test. It was prejudicial error to admit evidence of defendant's refusal to submit to a drunkometer test. Its admission constitutes reversible error.[3]

The state, citing State v. Maxwell, 249 Minn. 277, 81 N. W. (2d) 855, seems to be of the view that that decision obviates the necessity of complying with all the provisions of the above-mentioned ordinances. The language in that decision does not purport to change the language of or attempt to place any special construction upon either the ordinances or the statutes herein referred to. The validity of the ordinances here involved was not before this court in the Maxwell case. The court merely by way of dicta suggested that (249 Minn. 280, 81 N. W. [2d] 857):

"Where it is practicable, a person accused of committing an offense while under the influence of liquor should be given an opportunity to submit to the test suggested by the statute [which is a voluntary submission] so as to obviate the persistent complaint that conviction should not be had on the opinion testimony of enforcement officers."

It might well be considered regrettable here that the defendant, because of being under the shadow of insulin shock, did not comprehend what was being offered him by the way of a test, which it may reasonably be assumed from the testimony in this case would have cleared him from the charge of driving while under the influence of intoxicating liquor.

■ The state has moved for an order to strike from defendant's reply brief all references contained therein pertaining to the legislative history applying to the ordinances invoked in the instant case. Courts, however, have frequently held that in attempting to ascertain legislative intent it is proper to consider the contemporaneous legislative history, legislative and administrative interpretations of the statute, the mischief to be remedied, and the objects sought to be accomplished by the

---

[3]Cases commenting upon the necessity of keeping the drunkometer test voluntary in practice as well as in theory and on the lack of probative value in the refusal to submit to such a test are: Duckworth v. State (Okl. Cr. App.) 309 P. (2d) 1103; State v. Severson (N. D.) 75 N. W. (2d) 316; People v. Stratton, 286 App. Div. 323, 143 N. Y. S. (2d) 362; Jordan v. State (Tex. Cr. App.) 290 S. W. (2d) 666.

statute. See, Christgau v. Woodlawn Cemetery Assn. 208 Minn. 263, 293 N. W. 619; Barlau v. Minneapolis-Moline Power Imp. Co. 214 Minn. 564, 9 N. W. (2d) 6; Stabs v. City of Tower, 229 Minn. 552, 40 N. W. (2d) 362.

It seems well established that the rules of construction applicable to statutes are likewise applicable to ordinances. Smith v. Barry, 219 Minn. 182, 17 N. W. (2d) 324. We see no violation herein of Supreme Court Rule VIII (222 Minn. xxxii) by defendant's reference to pertinent legislative history for clarification purposes, and the motion to strike is denied.

■ Defendant contends that a nonexpert opinion concerning intoxication is not admissible where the witness has not observed the allegedly intoxicated person's actions and conduct. It is a recognized exception to the so-called opinion rule of evidence that lay persons are allowed to give their opinion concerning intoxication. As for other opinions it is necessary that there be an adequate foundation before such opinion is admissible, but traditionally the foundation required before an opinion regarding intoxication can be given has been testimony concerning observation of manner of walking and standing, manner of speech, appearance of eyes and face, and odor, if any, upon such person's breath. See, Clarke v. Philadelphia & Reading Coal & Iron Co. 92 Minn. 418, 100 N. W. 231.

In the instant case Sandberg, the driver of the other car, was allowed to testify over objection that in his opinion the defendant was intoxicated, even though the witness had stated unequivocally that he smelled no odor of liquor and the opinion lacked adequate and sufficient foundation. When Sandberg was asked the question, "Did you observe the eyes and face when he was out of the car?" he answered: "No, I can't say as I did." There is no affirmative evidence in the record that this witness observed the defendant walking or standing alone. The opinion by Sandberg was given after the witness had in fact stated the following things all of which would appear to be relevant as to the necessary foundation:

(1) That there was no opportunity to observe the defendant standing or walking alone;

(2)   That he had never heard the defendant say anything;

(3)   That he had not observed the appearance of defendant's eyes and face; and

(4)   That he had not detected any odor of alcohol on defendant's breath.

■   While it is recognized that the required foundation for opinions is generally within the discretion of the trial court, that discretion is never completely unlimited. When and if that discretion has been abused, the ruling below will not be allowed to stand. The state cites State v. Wilson, 244 Minn. 382, 69 N. W. (2d) 905; State v. Graham, 176 Minn. 164, 222 N. W. 909; and McKillop v. Duluth St. Ry. Co. 53 Minn. 532, 55 N. W. 739, in justification of the lower court rulings on the foundation question. The aforesaid cases are not controlling on the foundation issue here. The McKillop case states that (53 Minn. 532, 55 N. W. 739): "One who has witnessed a person's acts, appearance, and speech, may express an opinion whether he was intoxicated." In the Graham case the record apparently established that the witness had ample opportunity for both observation of and conversation with the allegedly intoxicated defendant. If anything, the Wilson case, if taken by analogy, furnishes support for defendant's contention in this case that the evidence does not sustain the finding of guilty.

■   Defendant also contends that the court erred in allowing as evidence the conclusion of a lay witness concerning his ability to determine whether or not a person is intoxicated. The state answers this point by stating that the point would be well taken if such conclusions stood alone. We think defendant's point well taken and that such conclusion was inadmissible whether standing alone or with something else.[4]

■   Finally, does the record herein disclose the existence of evidence from which the trier of fact may draw a reasonable inference that the defendant consumed intoxicating liquor during the half-hour period while driving from the Pioneer Building in St. Paul to the scene of the accident in Minneapolis, while a rainstorm was in progress. There is no

[4]Lestico v. Kuehner, 204 Minn. 125, 283 N. W. 122; Abar v. Ramsey Motor Service, Inc. 195 Minn. 597, 263 N. W. 917.

evidence in the record of defendant having stopped at a tavern or drinking place or consumed any liquor during that period. The state has produced no such evidence and it is quite apparent that none is available. It is also an added fact that no liquor was found upon his person or in his car. A half-hour period is the approximate uncontroverted driving time from downtown St. Paul to the scene of the accident.

It is the view of this court that the record as a whole clearly and convincingly supports the inference that defendant was suffering from insulin shock at the time in question and not from the consumption and influence of intoxicating liquor; that the finding of the court below does not have the support of a preponderance of the evidence and is contrary to the weight of the evidence. We reach the conclusion based upon the record herein that the evidence as a whole preponderates in favor of a finding of not guilty and that defendant's conviction upon that record should not be allowed to stand.

Reversed and defendant discharged.