**STATE of Minnesota, CITY OF EAGAN, Petitioner, Appellant,**

v.

**Taieb Hamid ELMOURABIT, Respondent.**

**No. C7–84–53.**

Supreme Court of Minnesota.

Aug. 23, 1985.

Kevin W. Eide, Eagan, for appellant.

Douglas Peine, Minneapolis, for respondent.

SIMONETT, Justice.

The court of appeals set aside a jury verdict that defendant was guilty of driving under the influence of intoxicating liquor, holding that the evidence was insufficient to sustain the conviction. *State v. Elmourabit*, 356 N.W.2d 80 (Minn.App. 1984). We granted the state's petition for further review, and now affirm.

On April 22, 1983, at 12:26 a.m., Officer Laurie Jane Tripp clocked a jeep approaching her squad car at 63 miles per hour in a 50 mile-per-hour zone. Because of this speeding infraction, she turned her squad car around and, in a distance of about three quarters of a mile, caught up with and stopped the vehicle. During all this time, she noticed nothing erratic about the operation of the jeep. In talking to the jeep's driver, defendant Taieb Elmourabit, Officer Tripp smelled alcohol on his breath. She observed that his eyes, behind tinted glasses, appeared to be glassy and bloodshot. Elmourabit told her he had personal problems and repeatedly pleaded for "a break." On the basis of these observations, Officer Tripp formed the opinion that Taieb Elmourabit was under the influence of intoxicating liquor. His plea for a break, she said, "had a big influence in it, too." Officer Tripp also had noted defendant's somewhat unsteady gait in walking to the squad car.

Upon being taken to the Eagan police station, defendant was given dexterity tests, consisting of walking a line, walking heel to toe, and standing on one foot while leaning back with eyes closed. These tests were video taped and the replay, presented at the trial, showed he performed these tests normally. Soon after taking the tests, while speaking on the phone to an attorney, Elmourabit became agitated. He fell to the floor, moaning and groaning, and requested a doctor. While waiting for an ambulance, Officer Tripp checked defendant's pulse. It appeared normal. Neither did the officer note any other objective signs of distress. The two ambulance paramedics, when they arrived, tested defendant's pulse and blood pressure as regular. When placed in the ambulance, defendant became physically aggressive, trying to bite and kick. He was eventually placed in restraints for the trip to the hospital. Elmourabit, who is of Moroccan descent, was difficult to understand, particularly when yelling and talking fast.

Three officers of the Eagan Police Department testified at the trial. One of the officers in addition to Tripp was of the opinion that defendant was under the influence of liquor. One of the paramedics testified she assumed that defendant was under the influence, while the other paramedic commented that defendant smelled of alcohol and was difficult to understand. While Elmourabit complained of vague chest pains, neither the officers nor the paramedics felt he was having a heart attack. Heart attack victims, in their experience, are usually quiet and apprehensive, not agitated and aggressive. One of the paramedics did think defendant was hyperventilating.

At no time was defendant given a test for alcohol in his breath, blood, or urine.

At trial, Elmourabit testified to similar hyperventilation episodes with chest pains in the previous 2 years. He said concern for these episodes had prompted him some days before to have made a doctor's appointment for later that very day. He also told about his personal problems, his worrying about a separation from his wife that had left him a single parent with two small children. Elmourabit testified he was employed at Sperry-Univac and, on the day involved, had worked the night shift, 3 p.m. to 11:30 p.m.; that he had left work at 11:30 p.m., drove the 2 miles to his home

where he stopped for about 10 minutes and, then, at the request of the live-in woman babysitter, left in his jeep to cash a check for laundry money at a restaurant about a mile away. He said he was at the restaurant from about 11:50 p.m. to 12:15 a.m. He cashed a check, and ordered two beers, drinking one but taking only a few sips of the other. Then he left the restaurant, and while on his way home was arrested at 12:26 a.m.

Two coworkers who worked under defendant testified Elmourabit had worked the night shift, and they did not see him drink or exhibit signs of drinking. The babysitter testified defendant came home after work, that he had nothing to drink at home, and, indeed, no alcohol was kept in the house. The waitress at the restaurant corroborated defendant's story of what happened at the restaurant. Defendant's canceled check that he had cashed at the restaurant was put in evidence. A nurse from the medical clinic testified that Elmourabit had, indeed, made an appointment with the clinic for that morning. The babysitter's sister testified to witnessing defendant experience a "chest pain" attack at a shopping mall the previous December.

The jury found defendant guilty of all three charges against him, namely, speeding, disorderly conduct, and driving under the influence of intoxicating liquor. The court of appeals reversed the latter two convictions. The state seeks review here only of the DWI reversal.

### The Issue

The issue is simply stated: Does the evidence sustain the guilty verdict? To put it another way, could the jury, "acting with due regard to the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, * * * reasonably conclude from the evidence contained in the record that the defendant was guilty of the offense charged"? *State v. Dodis*, 314 N.W.2d 233, 237 (Minn.1982).

"The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that the jury

believed the state's witnesses and disbelieved any contrary evidence." *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981); *see also, e.g., State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978).

### I.

We accepted this case for further review because of the evidentiary weight apparently assigned by the court of appeals to video-taped dexterity or sobriety tests. After noting that the replay of the video tape showed defendant successfully performing the tests, the court of appeals stated: "This documentary evidence has the same effect as positive testimony of an unimpeached witness." The court then quoted from *State v. Simonsen*, 252 Minn. 315, 323, 89 N.W.2d 910, 916 (1958), that "[p]ositive testimony of unimpeached witnesses cannot be disregarded when there is no real basis in the evidence for a finding that such evidence is either improbable or inconsistent." The court of appeals apparently felt that the negative results of the dexterity tests, in the absence of any strong contradictory evidence of intoxication, must be accepted as conclusive of defendant not being under the influence, or, at the least, must be considered sufficient to raise a reasonable doubt of guilt.

We think, however, the court of appeals assigns too much significance to the successful passing of dexterity tests. It is not uncommon for a person under the influence of liquor, where judgment or reflexes have been impaired, to nevertheless be able to perform the tests satisfactorily. Long ago, in *State v. Graham*, 176 Minn. 164, 168, 222 N.W. 909, 911 (1929), we acknowledged, "[A]lthough he can walk straight, although he may attend to his business and may not give any outward and visible signs to the casual observer that he is drunk," a person may still be under the influence. *See also* Richard S. Frase, Phebe S. Haugen & Martin J. Costello, *Minnesota Misdemeanors and Moving Traffic Violations* (1984) at 459 (the intoxicated person "may *not* appear drunk and, in fact, may handle self and vehicle quite well"). *Compare*

*Swapinski v. Commissioner of Public Safety,* 368 N.W.2d 322 (Minn.App.1985) (defendant tested .13 blood alcohol content, yet passed all three field sobriety tests). Of course, the successful passing of dexterity tests has probative value and may, as in this case, tend to corroborate defendant's testimony that he had only one beer, but the facts do not have, in and of themselves, any inherent "unimpeachable" character.

In *Simonsen,* the defendant's doctor testified convincingly and without contradiction that defendant, a diabetic, had suffered insulin shock, and while the court said this positive testimony could not be disregarded, it also stressed at least twice that it was reversing on the record as a whole. *Simonsen* is not authority for singling out one piece of evidence in a party's case for special or different consideration, nor does the *Simonsen* reasoning apply to a case where credibility issues abound. *Simonsen* is quite fact-bound and, like our case here, of little precedential value.

 The fact that defendant's performance was video taped, we might add, may enhance the forensic value of the test results but this "documentation" neither adds to nor subtracts from the results themselves.[1]

## II.

Considering the negative dexterity test results simply as one of many items of evidence to be weighed, the question still remains whether the evidence as a whole sustains the guilty verdict. The issue is a close one.

To sustain the conviction, the state stresses: (1) the speeding; (2) the odor of alcohol; (3) the slurred speech, seeming unsteadiness, and the glassy, bloodshot eyes; (4) the bizarre aggressive behavior and mood changes; and (5) the access to alcohol, especially at the restaurant-bar. On the other hand, in urging reversal of the conviction, the defendant stresses: (1) no erratic driving; (2) no proof of any

alcohol in the breath, blood, or urine; (3) satisfactory performance of the dexterity tests; (4) the unimpeached chronological sequence of events, corroborated by other witnesses, negativing any prolonged access to or opportunity for the consumption of alcohol; and (5) the undiagnosed medical problem.

To prove that defendant was under the influence of intoxicating liquor, the state is required to prove that the defendant was "so affected by intoxicating liquor as not to possess that clearness of intellect and control of himself that he otherwise would have * * *." *State v. Graham,* 176 Minn. 164, 169, 222 N.W. 909, 911 (1929). Ordinarily, the state proves its case by showing the amount of liquor consumed (either by witnesses or chemical tests), or by evidence of outward manifestations of intoxication, or by a combination of both methods.

Here the state lacked direct proof of actual consumption, except for defendant's admission of only one beer and a few sips of another. Consequently, the state relied primarily on outward manifestations of intoxication observed after the defendant was stopped. The inferences to be drawn from this evidence, however, are in somewhat uneasy equilibrium. Defendant was driving 13 miles over the speed limit, but this is not uncommon for sober drivers too. There was an odor of alcohol, but the recent drinking of one bottle of beer may leave an odor of alcohol on the breath. Defendant's speech was at times slurred, but English is not his native tongue. There was testimony of some lack of coordination, but the video-taped dexterity tests showed none. There was evidence of glassy, bloodshot eyes, but also evidence of a heightened hyperventilative state. There was evidence defendant was not having a heart attack, but neither could the officers nor the paramedics say authoritatively that defendant had no medical problems or was not experiencing pain. If defendant's behavior in the police station was at times

---

**1.** Here the test results were no help to the state, but the prosecutor made a tactical decision to play the video tape as part of his case to preclude defendant from playing the tape later as part of his defense where the favorable impact for defendant might be greater.

strange, to account for that behavior by the amount of alcohol consumed between 11:30 p.m. and 12:26 a.m., after allowing for defendant's itinerary on leaving work, seems also difficult to explain.

These are the kind of issues that this court, with rare exception, has always left to a jury. We conclude, however, that this is one of those rare exceptions. Even with the credence to be given the state's case, the unique facts and circumstances here, particularly in their various combinations, require us to conclude that the state's proof falls short of proof beyond a reasonable doubt. This being so, we affirm the court of appeals' reversal of defendant's conviction.

Affirmed.