STATE of Minnesota, Respondent,

v.

Douglas Dale HORNING,
Petitioner, Appellant.

No. C5–93–754.

Supreme Court of Minnesota.

July 28, 1995.

John M. Stuart, State Public Defender, Charlann E. Winking, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Margaret Chutich, Asst. State Atty. Gen., St. Paul, and Roger S. Van Heel, Stearns County Atty., St. Cloud, for respondent

Dean S. Grau, MN Soc. for Crim. Justice, Minneapolis, for amicus curiae.

## OPINION

GARDEBRING, Justice.

Appellant Douglas Horning was convicted of driving with a blood alcohol concentration of 0.10 or more in violation of Minn.Stat. § 169.121, subd. 1(d) (1992). The issue on appeal is whether, in a prosecution for driving with a blood alcohol concentration of 0.10 or more, the trial court erred in excluding evidence regarding Horning's "lack of impairment" prior to the administration of the Intoxilyzer test. The court of appeals affirmed the trial court, holding that the exclusion of lack of impairment evidence was not an abuse of discretion. We affirm because such evidence is not relevant to a crime based solely on blood alcohol content.

Horning's conviction arises out of a motor vehicle accident occurring on March 5, 1992 in Stearns County. On that evening, Horning left his home in St. Paul at approximately 6:00 p.m. to drive to Alexandria, Minnesota. He testified he stopped in Champlin, Minnesota where he drank one "screwdriver" before leaving at 7:30 p.m. Shortly before 9:00

p.m., Horning was involved in a collision with a semi-truck while driving on Interstate 94 near Melrose, Minnesota. Although Horning believed that he was struck from behind by another automobile, the cause of the accident is unclear.[1]

The testimony at trial was conflicting as to the events immediately following the collision. According to Horning, he was approached by the driver of the truck that collided with Horning's car, and they talked briefly about the condition of the car. Then, while the truck driver walked back to his truck to see if someone had called for the state patrol, an unidentified passerby approached Horning and offered him a brown paper bag with one 40–ounce bottle of malt liquor and "four or five other assorted beers." Horning testified that over the next ten minutes he drank the bottle of malt liquor and two or three cans of beer from the bag, and when the truck driver returned, "threw the bag into the ditch, like behind the car."

In contrast to Horning's testimony, the truck driver testified that he and Horning waited in the cab of his truck for the state patrol to arrive and that from the time he first spoke with Horning, Horning was never out of his sight. He further testified that Horning drank one cup of coffee after the accident, but he did not observe Horning drinking anything else.

A state patrol trooper arrived approximately 40 minutes after the accident. After preparing an accident report, the trooper drove Horning to Melrose where Horning's car had been towed and then to Sauk Centre where he was to be picked up and taken to Alexandria. Before Horning exited the trooper's car at Sauk Centre, the trooper administered a portable breath test which after 20 seconds indicated "fail." The trooper then took Horning to the police station in Sauk Centre where he administered an Intoxilyzer test.

In regard to Horning's Intoxilyzer test, the trooper testified that he is a certified Intoxilyzer operator, he operated the Intoxilyzer properly, and he waited the requisite observation time before starting the test. Horning's reported value at 11:18 p.m. was a blood alcohol concentration of 0.15. The trooper further testified that he interviewed Horning immediately following the Intoxilyzer test and recorded his responses on a standard interview form. According to the trooper, Horning answered "no" when asked whether he had anything to drink since the accident, and stated "Nyquil and cough medicine" when asked whether he had consumed alcohol other than at Champlin within the previous 24 hours.[2]

In addition, the state called an expert witness who testified that, based on his observation of the test record and the maintenance records, the Intoxilyzer instrument used to test Horning was in proper functioning order and provided an accurate and reliable record of the blood alcohol concentration level in Horning's breath. The expert also estimated Horning's blood alcohol concentration level at the time of the accident by taking the 11:18 p.m. result of 0.15 and extrapolating back to 9:00 p.m. by applying an average elimination rate of 0.016 alcohol concentration per hour. Based on this extrapolation method, the expert estimated Horning had a 0.188 to 0.193 blood alcohol concentration at approximately 9:00 p.m.

After hearing the testimony of the state's fact witnesses, the trial court granted the state's motion in limine to limit testimony to evidence relating to Horning's blood alcohol concentration and to exclude any evidence regarding whether Horning appeared to be under the influence of alcohol. Specifically, Horning sought to introduce evidence showing his conduct at the time of the accident was inconsistent with the Intoxilyzer test result of 0.15 and with the extrapolated estimate of 0.188 to 0.193 blood alcohol concentration. Horning also sought to question the

1. The state trooper who investigated the accident site testified he examined Horning's car and did not notice any damage to the back end of the car.

2. Horning disagreed with the trooper's account of the interview. He testified that, following the

test, the trooper asked whether he had anything to drink since the arrest and Horning responded "no." Horning also recalled the trooper asking him whether he had anything to drink since the accident, to which Horning responded he did.

state's expert witness about the Bureau of Criminal Apprehension Intoxilyzer training manual, which indicates a person with an alcohol concentration of 0.18 would show clinical signs of intoxication. Moreover, although he was permitted to assert the affirmative defense of post-driving consumption of alcohol, Horning wanted to offer lack of impairment evidence to support this defense. As a result of the court's ruling, Horning was prevented from introducing this evidence.

Although Horning initially was charged with one count of driving under the influence of alcohol and one count of driving with an alcohol concentration of 0.10 or more, the state dismissed the former charge and added one count of having an alcohol concentration of 0.10 or more as measured within two hours of driving. Horning was convicted of driving with an alcohol concentration of 0.10 or more and acquitted of the charge of having an alcohol concentration of 0.10 or more as measured within two hours of driving. The court of appeals affirmed the conviction, finding that, because lack of impairment evidence is irrelevant to a charge of driving with an alcohol concentration of 0.10 or more, the exclusion of such evidence was not an abuse of discretion. On appeal, Horning urges this court to find that the trial court improperly excluded relevant, circumstantial evidence when it granted the state's motion to exclude lack of impairment evidence.

■ Rulings involving the relevancy of evidence are generally left to the sound discretion of the trial court. *State v. Ture*, 353 N.W.2d 502, 515 (Minn.1984). The party claiming error has the burden of showing both the error and the resulting prejudice. *State v. Loebach*, 310 N.W.2d 58, 64 (Minn. 1981). The basic requisite for the admissibility of any evidence is that it be competent and relevant. *See* Minn.R.Evid. 402. The threshold determination of relevance turns on whether the evidence logically or reasonably tends to prove or disprove a material fact in issue, or tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or

presumption regarding the existence of a material fact. Minn.R.Evid. 401, committee comment.

■ Looking at the definition of the crime at issue here, it seems clear that lack of impairment evidence is not relevant to the proof or disproof of a violation of Minn.Stat. § 169.121, subd. 1(d):

> Subd. 1. **Crime.** It is a crime for any person to drive, operate, or be in physical control of any motor vehicle within this state:
>
>    *    *    *    *    *    *
>
> (d) when the person's alcohol concentration is 0.10 or more;
>
>    *    *    *    *    *    *

In order for the state to sustain a conviction under subd. 1(d) there must be proof beyond a reasonable doubt of only two facts: that the defendant was operating a vehicle within this state and that at that time his/her alcohol concentration was .10 or more. Thus, proof of a violation of subd. 1(d) involves a narrowly focused inquiry directed solely to a determination of whether a defendant had a .10 or greater blood alcohol level at the time of driving. The only evidence relevant to this inquiry is related to: (1) whether the defendant was driving, a matter not contested in this case, and (2) the chemical testing which determines blood alcohol concentrations.

In the face of information that a defendant did not weave when he drove, that he did not slur his speech, that he did not walk unsteadily, one might ask: so what? While that information might help a factfinder determine whether a defendant was guilty of the crime of driving under the influence, a violation of Minn.Stat. § 169.121, subd. 1(a) (1994), it has no bearing on the critical question here—what was appellant's blood chemistry?[3] Whether appellant's consumption of alcohol visibly impaired his driving is not at issue. Lack of impairment evidence does not logically or reasonably tend to prove or disprove appellant's blood alcohol level, nor does

---

**3.** The concurrence asserts that we have failed to focus on *"when* Horning's blood chemistry is relevant."* However, that begs the question of whether lack of impairment evidence is relevant to a violation of law based on blood chemistry, whenever measured.

it tend to make such a fact more or less probable, nor does it afford a basis for a reasonable inference or presumption regarding whether his blood alcohol level was .10 or greater. As a result, evidence of appellant's lack of impairment is simply not relevant to a subd. 1(d) charge.[4]

Our concern is not that the lack of impairment evidence is unreliable. It is true that we have previously noted the limited value of visible evidence of intoxication. In *State v. Graham,* we said, "[a]lthough he can walk straight, although he may attend to his business, and may not give any outward and visible signs to the casual observer that he is drunk," a person may still be under the influence. 176 Minn. 164, 168, 222 N.W. 909, 911 (1929). This is precisely why the legislature chose to create a "drunk driving" violation which does not depend on the outward manifestations of intoxication. Here, the reliability of the lack of impairment evidence is not at issue, only its relevance to the task at hand, determining a specific parameter of blood chemistry.

Furthermore, we believe that the powerful public policy statement of our drunk driving laws militates against admission of lack of impairment evidence in prosecutions for violation of the blood alcohol limitation.[5] The overall statutory scheme involving drunk driving which the legislature has crafted carefully over a period of years includes a number of separately defined crimes. Under this scheme, drunk drivers may be prosecuted for a number of specific illegal acts, including:

(1) operating a vehicle while under the influence of alcohol, under Minn.Stat. § 169.121, subd. 1(a);

(2) operating a vehicle with a blood alcohol concentration of 0.10 or more, under Minn. Stat. § 169.121, subd. 1(d), which is at issue here, and

(3) operating a vehicle with a blood alcohol concentration of 0.10 measured within two hours of the time of driving, under Minn. Stat. § 169.121, subd. 1(e) (1994).

Each of these specifically enumerated crimes, which was enacted into law at a different time, is directed at impaired driving or driving ability, evidenced in different ways. If the crime described in subd. 1(a)—driving while under the influence of alcohol—defined all risky behavior, there would be no need for the other provisions; but it does not, and there is a need for them, simply because not all drunk drivers manifest impairment visible to the arresting officer.

Finally, this court has specifically recognized that laws prohibiting a person from driving a motor vehicle while intoxicated are remedial statutes, and are to be "liberally interpreted in favor of the public interest and against the private interests of the drivers involved." *State, Dept. of Public Safety v. Juncewski,* 308 N.W.2d 316, 319 (Minn.1981). We have said that the legislature has demonstrated its intent to have this statute cover "the broadest possible range of conduct" and to be given "the broadest possible effect." *Id.* Indeed, by creating both an offense of driving under the influence of alcohol, subd. 1(a), and an offense of driving with an alcohol concentration of 0.10 or more, the statute

---

**4.** The concurrence agrees that the impairment evidence is irrelevant to the state's burden because it has no bearing on Horning's actual alcohol concentration, but argues that it is relevant as rebuttal. To this we can only respond again, if the only element of the crime at issue is blood alcohol concentration, how can behavior be relevant, even on rebuttal?

**5.** The legislature's intent to eradicate drunk driving is repeatedly evidenced in a host of statutory amendments. For example, in 1988, a provision was added to impose mandatory penalties for habitual DWI offenders. *See* 1988 Minn.Laws ch. 408 § 1, *currently codified at* Minn.Stat. § 169.121, subd. 3(a) (1994). Similarly, in 1993, the clause providing that an alcohol concentration of 0.05 or less is prima facie evidence that a

person was not under the influence of alcohol at the time, was changed to provide that an alcohol concentration of 0.04 is relevant evidence as to whether a person was under the influence. Minn.Laws ch. 347 § 4, *currently codified at* Minn.Stat. § 169.121, subd. 2 (1994). Finally, in 1978, the legislature broadened the scope of the statute by deleting "actual" physical control, thus, a person can violate the statute without actually driving a vehicle. *See* 1978 Minn.Laws ch. 727 § 2, *currently codified at* Minn. § 169.121, subd. 1 (1994); *see also State, Dept. of Public Safety v. Juncewski,* 308 N.W.2d 316, 319–20 (Minn.1981) (holding car engine need not be running to violate Minn.Stat. § 169.121, subd. 1(a) (1980)).

reflects an intent to create as effective and encompassing a remedy as possible to eradicate drunk driving from our streets and highways. To allow the admission of lack of impairment evidence on a charge of driving with an alcohol concentration of 0.10 or more would undermine that broad and encompassing remedy which the legislature has mandated. We conclude that there was no abuse of discretion in the trial court's decision to exclude the lack of impairment evidence, and the decision of the court of appeals is affirmed.

KEITH, Chief Justice (concurring specially).

Although I concur in the result the court reaches today, I disagree with the majority's reasoning with respect to the admissibility of impairment evidence in this case. Contrary to the majority opinion, I am unconvinced that impairment evidence is wholly irrelevant in a prosecution for driving with an alcohol concentration of 0.10 or more in violation of Minn.Stat. § 169.121, subd. 1(d).

First, even though this court has recognized that we should not place undue reliance on outward manifestations of intoxication, *see State v. Elmourabit,* 373 N.W.2d 290, 292 (Minn.1985), we have never found such evidence so unreliable as to exclude it on that basis alone. For example, in *Elmourabit,* this court noted "[i]t is not uncommon for a person under the influence of liquor, where judgment or reflexes have been impaired, to nevertheless be able to perform the [dexterity] tests satisfactorily." 373 N.W.2d at 292. We went on to hold, however, that the results of such tests *do* have probative value and are one of many items to be weighed by the factfinder. *Id.* at 293. Moreover, we also have recognized that observable indicia of intoxication are sufficiently reliable in other settings. For example, if Horning had been charged with driving under the influence of alcohol, the state clearly could introduce evidence of impairment to support the charge. *See State v. Shepard,* 481 N.W.2d 560, 562–63 (Minn.1992). Further, under Minn.Stat. § 169.121, subd. 6 (1994), a peace officer may require a driver to submit to a preliminary screening test when he or she "has reason to

believe from the manner in which a person is driving, operating, controlling, or acting upon departure from a motor vehicle, * * * " that the driver is under the influence of alcohol or a controlled substance. Pursuant to this provision, Minnesota courts frequently have relied on impairment evidence in the context of an officer's determination of whether to request a driver to submit to a chemical alcohol concentration test. *See Costillo v. Commissioner of Pub. Safety,* 416 N.W.2d 730, 733 (Minn.1987). Thus, our cases suggest that although impairment evidence may not be conclusive as to an alcohol concentration of 0.10 or more, it is not so unreliable that the factfinder should be precluded, on that basis alone, from receiving the evidence and weighing it accordingly.

Second, although I agree with the majority that driving with an alcohol concentration of 0.10 or more constitutes a separate chargeable offense from driving under the influence of alcohol, I do not agree the factual bases for liability are always exclusive. Minnesota's criminal DWI statute provides:

> Subdivision 1. **Crime.** It is a crime for any person to drive, operate, or be in physical control of any motor vehicle within this state * * *:
>
> (a) when the person is under the influence of alcohol;
>
> \*   \*   \*   \*   \*   \*
>
> (d) when the person's alcohol concentration is 0.10 or more;
>
> (e) when the person's alcohol concentration as measured within two hours of the time of driving is 0.10 or more * * *.

Minn.Stat. § 169.121.

It is an elementary principle of evidentiary law that evidence irrelevant to the state's burden of proof may nonetheless be relevant for other purposes. In regard to the subd. 1(d) charge, the state had the burden of proving that Horning drove in Stearns County with an alcohol concentration of 0.10 or more. Clearly, as the majority notes, evidence of impairment or lack thereof is irrelevant to the state's burden because it has no bearing on Horning's actual alcohol concentration. After the state has established its prima facia case, however, a defendant may

rebut the state's evidence or impeach the state's witnesses with other relevant evidence. It is this critical second step that the majority ignores.

In the present case, the accident giving rise to the Intoxilyzer test occurred at 9:00 p.m., and the trooper administered the test at 11:19 p.m., more than two hours later. The test result indicated that Horning's alcohol concentration at the time of the test was 0.15. This result, however, is relevant to the charge of driving with a blood alcohol concentration of 0.10 or more *only* to the extent that it reflects Horning's alcohol concentration *at the time of the accident,* more than two hours earlier.[1] At trial, the state attempted to establish the necessary link between the test result and Horning's alcohol concentration at the time of the accident. Using an extrapolation method based on typical alcohol absorption rates and based on an assumption that Horning's alcohol concentration was falling from the time of the accident to the time of the test, the state's expert witness estimated Horning's alcohol concentration was between 0.188 and 0.193 at the time of the accident.

Because the state's expert did not base his testimony on the results of an Intoxilyzer test administered immediately after the accident, Horning could not attack the results of such a test.[2] Instead, the state's evidence consisted of its expert's post-accident extrapolation, and Horning was relegated to attacking these extrapolations. Horning therefore challenged the state's extrapolated estimates by contending that his alcohol concentration was *rising* from the time of the accident to the time of the test, rather than *falling* as the state's expert assumed. To support his contention, Horning sought to admit evidence that he did not appear to be impaired at the time of the accident. This evidence is relevant to his defense that his alcohol concentration was rising because if he showed no

clinical signs of intoxication, it is less likely that his alcohol concentration was 0.188 at the time of the accident, it is more likely that his alcohol concentration was rising after the accident, and consequently, it is less likely that Horning's alcohol concentration was 0.10 or more at the time of the accident. In this situation, whether Horning's alcohol concentration was above or below 0.10 at the time of the accident is certainly relevant and material to the issue of whether Horning violated this state's prohibition against driving with an alcohol concentration of 0.10 or more.

We have never required more than a slight probative value in determining relevance, and I find no reason to treat the impairment evidence in this case differently from any other circumstantial evidence admissible for impeachment purposes. I would limit this holding, however, to situations in which a defendant is charged under Minnesota Statutes section 169.121, subdivision 1(d) and the state offers extrapolation testimony to link the result of a post-driving alcohol concentration test to the defendant's alcohol concentration at the time of driving. In such a case, impairment evidence offered by the defendant is relevant for the limited purpose of impeaching the state's extrapolation testimony. Moreover, although I believe the exclusion of impairment evidence was an abuse of discretion, I would conclude the error was harmless. In this case, testimony showed that the Intoxilyzer test was administered properly, the Intoxilyzer machine was operating properly, and the expert believed it produced an accurate and reliable test result. The jury also was presented with a number of credibility issues it presumably resolved in favor of conviction. Moreover, if impairment evidence had been admitted, the state would have introduced additional evidence of insobriety to counter Horning's lack of impairment. Thus, I would conclude that the trial

1. Although the majority opinion recognizes that one critical issue is "the chemical testing which determines blood alcohol concentrations," it fails to discern *when* Horning's blood chemistry is relevant. That is, the majority opinion fails to recognize that the critical issue is: What was Horning's blood chemistry *at the time of the accident?*

2. Granted, Horning could attack the results of the test conducted more than two hours after the accident occurred, but this test was evidence relating to the charge of having an alcohol concentration of 0.10 or more two hours after driving rather than the charge for which he was convicted.

court's exclusion of the impairment evidence was harmless error.

Notwithstanding, I cannot express more clearly my concern that the majority has, with this opinion, invaded the province of the jury in discarding basic principles of evidence law in favor of a perceived public policy. Clearly, we are presented with a pressing need to eradicate drunk driving in Minnesota. I cannot agree, however, that preventing the jury from performing its duty in weighing otherwise relevant evidence is a proper way to accomplish such a goal.

COYNE, Justice (concurring specially).

I join in the special concurrence of Chief Justice Keith.

ANDERSON, Justice (concurring specially).

I join in the special concurrence of Chief Justice Keith.