**STATE of Minnesota, Respondent,**

v.

**Robert Martin CAVEGN, Appellant.**

**No. 50396.**

Supreme Court of Minnesota.

June 27, 1980.

Rehearing Denied Aug. 1, 1980.

Stephen W. Cooper, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., Thomas W. Foley, County Atty., and Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

Heard before OTIS, PETERSON, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

Defendant Robert Cavegn was charged with possession of marijuana and LSD. The parties agreed to waive a jury trial and try the matter before the Ramsey County District Court and further agreed that the omnibus hearing testimony, additional testimony by defendant, and police records constituted the trial record. The trial court found the defendant guilty of both possession of marijuana in excess of 1.5 ounces and possession of LSD. We affirm.

On December 27, 1978, St. Paul Police Officers Edward Lundholm and John Culhane were approached by two young men, Bradley Peterson and Michael Luchow, who asked if they could speak to one of the officers. Officer Lundholm talked to the two men alone, and testified that they told him that defendant had given them three or four LSD microdots to sell. The microdots were subsequently analyzed and presumptively shown to contain LSD. Peterson and Luchow told Officer Lundholm that defendant was a middleman and that they had been to the residence of defendant's supplier, Rusty, and had seen large quantities of LSD there.

Information concerning the defendant was also obtained from the Narcotics Division. Officers Lundholm and Culhane were told that defendant sold drugs in the vicinity of Minnehaha and Snelling Avenues in St. Paul; that he carried his narcotics in a brown paper bag; and that he could be expected to drop the bag and run if approached.

Sergeant Pitman of the Narcotics Squad suggested that officers stop and investigate or search defendant if they saw him acting suspiciously. Officer Culhane prepared an information report for the police rollcall bulletin board which stated that defendant was believed to be dealing in drugs in the vicinity of Minnehaha and Snelling and that he usually carried narcotics in a brown pa-

per bag. A photograph of defendant was included with the bulletin. No attempt was made to get a search warrant or an arrest warrant for defendant.

Several days later, on January 2, 1979, Officers Gerald Seliski and Herbert Carlson, having read the information report on defendant, noticed him walking along University Avenue between Avon and Grotto Streets at 11:59 p. m. The officers stopped their squad car next to defendant and Officer Seliski got out of the passenger side and told defendant by name to stop. Officer Carlson radioed their position before joining Seliski.

Seliski noted that defendant carried a Clark Submarine Sandwich bag in his hands. Defendant held his arms tightly pinned against his body, holding something underneath his jacket. Defendant's outer jacket was partially unzipped and part of a large brown grocery bag was sticking out over the jean jacket he wore underneath. Officer Seliski testified that because of the time of night, defendant's apparent nervousness, and the fact that defendant was holding something close to his body, he was concerned about his personal safety. Seliski told defendant that he wanted to frisk him, and defendant replied, "Go ahead." Seliski asked defendant to unzip his outer jacket the rest of the way. When defendant did so, the brown paper bag fell to the ground. Seliski asked what was in the bag, and defendant said, "You know." Seliski replied that he did not know, and defendant responded, "You know. I told them * *. I told [the Parole Board] I was still going to smoke grass." At this point, Seliski opened the brown paper bag, and observed what appeared to be marijuana in plastic baggies. Defendant was arrested, placed in the squad car, and given his *Miranda* warnings. Other items taken from defendant included thirteen LSD microdots found in the brown paper bag, a small coin purse containing two marijuana joints, some plastic bags, a scale, and $76 in cash.

At 10:45 a. m. on January 3, Sergeant Schwartz asked defendant to read, initial, and sign a standard *Miranda* waiver form.

Defendant refused to make a written statement, but did talk to Schwartz. He stated that all he had done was buy a quarter pound of pot and added, "Whoever heard of going to jail for marijuana, anyhow." Defendant was released later that day. He went to the Narcotics Division office and asked Sergeant Jan Pitman for his $76. When Pitman replied that the money would be held as evidence because of the dope found in defendant's possession, defendant said, "What do you think I bought it with?" or "That is what I bought the dope with." When defendant was told that he was being released pending further investigation because the substances seized had not yet been analyzed by the crime lab, defendant stated, "Well, doesn't the crime lab know what weed looks like?"

Defendant testified in his own behalf at the *Rasmussen* hearing, and his version of the arrest differed somewhat from that of the officers. Defendant claimed that the brown paper bag was not visible until he unzipped his outer jacket at Seliski's request. Defendant also maintained that he showed no signs of nervousness. When defendant gave additional testimony pursuant to the court trial, he testified that he knew that marijuana was in the brown paper bag, but denied knowing that the bag also contained LSD. When questioned about his relationship to Peterson and Luchow, defendant denied giving them LSD, but admitted that he had been acquainted with them several years earlier.

Defendant raises three issues on appeal:

(1) Was the police officers' investigative stop and frisk of defendant proper under the circumstances of this case?

(2) Were defendant's statements to police officers properly admitted into evidence?

(3) Was the cross-examination of defendant concerning his attempt to persuade the two young men to sell LSD for him properly permitted by the trial court?

1. Defendant argues that the police had no right to stop and question him without a warrant because the circumstances of this case do not fit into any of the exceptions to

the warrant requirement. The trial court upheld the stop and frisk under the doctrine of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

The United States Supreme Court held in *Terry v. Ohio* that a police officer can lawfully make a forcible investigative stop of an individual and frisk him for weapons on less than traditional probable cause if he is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21, 88 S.Ct. at 1880. *Accord, e. g., State v. Johnson*, 257 N.W.2d 308 (Minn.1977); *State v. McKinley*, 305 Minn. 297, 232 N.W.2d 906 (1975); *City of St. Paul v. Vaughn*, 306 Minn. 337, 237 N.W.2d 365 (1975).

■ The information necessary to support an investigative stop and frisk need not be based on the officer's personal observations. An informant's tip may be adequate if it has sufficient indicia of reliability. However, the level of information necessary for probable cause to arrest is not required for an investigative stop and frisk. *Adams v. Williams*, 407 U.S. at 145–7, 92 S.Ct. at 1922–1923. Moreover, this information may have been acquired through regular police channels, and the underlying basis of official suspicion need not be known to the officer acting in the field. *State v. Radil*, 288 Minn. 279, 179 N.W.2d 602 (1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971); *State v. Stark*, 288 Minn. 286, 179 N.W.2d 597 (1970), *cert. denied*, 402 U.S. 930, 91 S.Ct. 1529, 28 L.Ed.2d 864 (1971); *United States v. Impson*, 482 F.2d 197 (5th Cir.), *cert. denied*, 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973).

■ In the present case, it would appear that the police officers were justified in stopping defendant to investigate the possibility that he was illegally carrying controlled substances. The officers had been told that defendant was selling drugs in the general area where they observed him. The most recent confirmation of this had come from Bradley Peterson and Michael Luchow five days earlier, and the information was repeated to the arresting officers on the day of the arrest. When the officers first noticed defendant, he was walking down the street at a late hour carrying a paper bag; the officers had been informed that defendant carried drugs in a brown paper bag and would drop it and run if approached. Upon closer observation, the officers realized that defendant was carrying a submarine sandwich bag, but they also noticed that defendant held a brown paper bag very tightly underneath his outer jacket. All of these specific facts, together with rational inferences therefrom, would justify the officers' conclusion that illegal activities might be afoot and should be investigated. As the United States Supreme Court stated in *Adams v. Williams.*

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. See [392 U.S.] at 23, 88 S.Ct., at 1881. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

407 U.S. at 145–6, 92 S.Ct. at 1923.

■ After Officer Seliski had stopped defendant on the street and had walked over to talk to him, Seliski decided to frisk defendant. Seliski testified that his decision was based on fear for his personal safety, which arose from a combination of factors: the lateness of the hour; defendant's apparent nervousness; and the fact that defendant was clutching something close to his body. The Supreme Court has held in *Terry v. Ohio* and its progeny that a weapons frisk of an individual stopped under the *Terry* rationale is permissible to protect the safety of the police officer. In *Terry* the Court stated: "The officer need

not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27, 88 S.Ct. at 1883. *Accord, State v. Gannaway*, 291 Minn. 391, 191 N.W.2d 555 (1971). Such a search is limited to the outer clothing of an individual for the purpose of discovering weapons which might be used to assault the officer. *Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. at 1884. In the present case, the trial court, as the finder of fact, concluded that Seliski's concern for his own safety was reasonable under the circumstances, and we agree. When defendant unzipped his outermost jacket, the brown paper bag he had been holding close to his chest fell to the ground. When asked what was in it, defendant responded, "You know," and added that he had told the Parole Board that he was still going to smoke grass. Seliski then opened the bag and observed what appeared to be marijuana.

■ Requiring the defendant to unzip his jacket and opening the paper bag under these circumstances falls outside of the parameters of a *Terry* stop and frisk. There is no evidence to show that Officer Seliski believed that the bag contained a weapon which might be used against him. Therefore, Seliski needed probable cause to open the bag and examine its contents.

■ We hold that Officer Seliski had probable cause to investigate the bag and to arrest the defendant. First, defendant indirectly admitted to Seliski before the officer opened the bag that it contained marijuana: defendant stated that Seliski knew what was in the bag and that he had told the Parole Board that he was going to smoke marijuana. Second, Seliski had information from other members of the police department that defendant carried drugs in a brown paper bag. Although the source of this information was not revealed, it is undisputed that observations of other government officers engaged in a common investigation are a reliable basis for finding probable cause. *United States v. Ventresca*, 380

U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Furthermore, some leeway as to the origins of information from police sources may be tolerated with respect to certain conclusions derived from a prior police investigation. 1 W. LaFave, *Search and Seizure*, § 3.5 at p. 638. And, as in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), corroboration of the information could be found in the very circumstances in which defendant was observed: walking down University Avenue late at night with a paper bag held tightly under his coat. Finally, the United States Supreme Court held in *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), that the reputation of a defendant can be considered as one factor in determining probable cause.

Numerous federal decisions have held that when evidence is seized from certain personal containers without a warrant, and there is no separate justification for failing to obtain a warrant (*e. g.*, a search incident to arrest, or "exigent circumstances"), the evidence must be suppressed. *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (a locked footlocker taken from the open trunk of an automobile); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (unlocked suitcase); *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979) (closed duffel bag); *United States v. Calandrella*, 605 F.2d 236 (6th Cir. 1979) (briefcase).

The United States Supreme Court, in *Chadwick*, recognized that the determination of when a warrant is necessary to investigate the contents of a seized container is essentially a line-drawing problem, one which must turn on the facts of each case. And in *Sanders*, the Court stated:

Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. * * * There will be difficulties in determining which parcels * * * require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage

can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.

99 S.Ct. at 2593–4, n. 13.

In *United States v. Neumann*, 585 F.2d 355 (8th Cir. 1978), a pre-*Sanders* decision, the court of appeals upheld the seizure of contraband taken from a closed box on the floor of an automobile, stating that there was "an insufficient expectation of privacy in an unsecured cardboard box sitting in plain view in the passenger compartment of an automobile."

▪ In the present case, the paper bag carried by defendant did not connote such an expectation of privacy that the police officers should have been required to obtain a warrant before investigating its contents. A grocery bag, like a cardboard box, is not usually a "repository of personal effects" and should not be subject to the warrant requirement, as is a suitcase, duffel bag, or footlocker.

▪ We conclude, based upon either of the legal principles discussed above, that a search warrant was not required. The search was incident to a lawful arrest, had the officers wished to proceed to arrest at any time upon all the information they possessed, including the specific violations spelled out by Peterson and Luchow which represented probable cause in themselves. Evidently the police hoped for a stronger case before arrest. Secondly, the paper bag was not a usual "repository of personal effects" under the *Chadwick* doctrine.

▪ 2. Defendant claims that his statements concerning the contents of the paper bag made at the time of the stop are inadmissible because they were made incident to an illegal stop and were given in response to police questioning before defendant had been given his *Miranda* warnings. We concluded above that the stop and frisk of defendant was legal. Furthermore, the threshold question asked by Seliski—"What's in your bag?"—is the type of preliminary, investigatory question which

does not require *Miranda* warnings. *State v. Martin*, 297 Minn. 470, 212 N.W.2d 847 (1973); *State v. Kinn*, 288 Minn. 31, 178 N.W.2d 888 (1970).

▪ Defendant also argues that statements made by him to Sergeant Schwartz while in custody should not have been admitted into evidence because he had refused to give a written statement and therefore all questioning should have ceased. Sergeant Schwartz gave defendant a written *Miranda* form to read and sign. Defendant complied, and indicated that he did not want to make a written statement but that he would talk verbally with Schwartz. There is no evidence that defendant refused to give any statement and then Schwartz continued to question him in violation of his rights.

▪ Finally, defendant claims that his statements to the police while attempting to obtain the return of his personal property were improperly admitted into evidence because they were fruits of an illegal search and arrest. Again, as mentioned above, the stop and frisk and subsequent arrest of defendant were permissible, and therefore defendant's statements constitute admissible evidence.

3. Defendant's final contention is that the state should not have been allowed to cross-examine him concerning his attempt to induce Peterson and Luchow to sell LSD for him. The cross-examination took place during defendant's supplemental testimony after it was agreed to submit the matter to the court without a jury trial. Defendant argues that the cross-examination was improper because the state failed to give notice of its intent to introduce evidence of other crimes as required by *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965), and Minn.R.Crim.P. 7.02, and because evidence of prior wrongdoing is generally inadmissible.

▪ Defendant's arguments must fail for several reasons. First, Officer Lundholm had already testified to his conversations with Peterson and Luchow as part of the omnibus hearing. Defendant, through

his counsel, stipulated to the admission of all of the evidence received at the omnibus hearing for purposes of the court trial. Defendant cannot now claim surprise or prejudice because of a failure to give Spreigl notice about cross-examination concerning events already testified to in the trial record. Surely defendant must be held to have waived his right to question the admission of evidence of this prior wrongdoing. *See, e. g., State v. Nordin,* 297 Minn. 495, 210 N.W.2d 241 (1973); *State v. Bellcourt,* 312 Minn. 263, 251 N.W.2d 631 (1977). Secondly, evidence of defendant's previous solicitation of Peterson and Luchow to sell LSD for him is especially relevant to the defense adopted by defendant when he took the stand for additional testimony: defendant claimed that he did not know that LSD as well as marijuana was in the paper bag. Evidence that he had previously given LSD microdots to others and had requested them to sell LSD for him is relevant to the credibility of this defense, and thus relevant to the crime charged. As such, it is admissible even though it incidentally relates to a collateral offense. *State v. Martin,* 297 Minn. 470, 212 N.W.2d 847 (1973); *State v. Morgan,* 310 Minn. 88, 246 N.W.2d 165 (1976), *cert. denied,* 430 U.S. 936, 97 S.Ct. 1564, 51 L.Ed.2d 782 (1977). Finally, it is worth noting that the state did not introduce independent evidence of defendant's prior wrongdoing; instead, the state questioned defendant about his relationship to Peterson and Luchow and defendant denied giving them LSD. Defendant could not have been prejudiced by questions relating to an incident already testified to by Officer Lundholm.

Affirmed.