STATE OF MINNESOTA

IN SUPREME COURT

A24-0540

Court of Appeals                                                    Procaccini, J.

Melissa Ann Lorsung,

        Respondent,

vs.                                                                Filed:  February 4, 2026
                                                                   Office of Appellate Courts

Commissioner of Public Safety,

        Appellant.

————————————————

Ryan J. Grove, Rogosheske, Rogosheske & Atkins, PLLC, South Saint Paul, Minnesota, for respondent.

Keith Ellison, Attorney General, Ryan Pesch, Assistant Attorney General, Saint Paul, Minnesota, for appellant.

————————————————

S Y L L A B U S

Based on the totality of the circumstances—including respondent's admission to drinking three beers and backing her car into a pedestrian in a bar parking lot at closing time—a police officer's request for a preliminary breath test from the respondent was supported by an objectively reasonable suspicion of driving while impaired, which was not

dispelled by the existence of other factors that diminished but did not conclusively negate the basis of the reasonable suspicion.

Reversed.

## O P I N I O N

PROCACCINI, Justice.

In this case we decide whether a reasonable suspicion of impairment supported a police officer's request that respondent Melissa Lorsung perform a preliminary breath test (PBT) to determine her alcohol concentration. Before the request, Lorsung admitted to drinking three beers and backing her car into a pedestrian in a bar parking lot after the bar closed. But the officer observed no physical signs of impairment, Lorsung successfully completed a horizontal gaze nystagmus (HGN) test, and the statements of the officer and a colleague on the scene indicated that they did not believe that Lorsung was impaired. In reviewing the revocation of Lorsung's driver's license by the appellant Commissioner of Public Safety, the district court determined that there was a reasonable suspicion that Lorsung had been driving while impaired and that the reasonable suspicion supported the PBT request. The court of appeals reversed, holding that Lorsung's satisfactory HGN test result and other factors dispelled the reasonable suspicion and rendered the PBT request unlawful. Because we conclude that, under the totality of the circumstances, reasonable suspicion of impaired driving supported the PBT request—and that reasonable suspicion was not dispelled by the existence of other factors that diminished but did not conclusively negate the basis for a reasonable suspicion of impairment—we reverse the decision of the court of appeals.

2

# FACTS

Lorsung filed a petition in district court challenging the Commissioner's revocation of her driver's license, arguing that a request for a preliminary breath test (PBT) was unlawful because it was not supported by reasonable suspicion that she had been driving while impaired. *See* Minn. Stat. § 169A.53, subd. 2. The district court held an implied consent hearing. At the hearing, New Brighton Police Officers S and Y testified, and Lorsung introduced Officer S's incident report and footage from both officers' body-worn cameras. The evidence presented at the implied consent hearing included the following facts, which are not in dispute.

Officers S and Y responded to an accident between a car and pedestrian in the parking lot of a bar in New Brighton, shortly after the bar's 2:00 a.m. closing. Officer S was the primary officer, and Officer Y was his backup. When Officer S arrived at the scene, another officer informed him that all parties involved had been drinking at the bar.

Officer S approached Lorsung, the driver of the car, at 2:20 a.m. Lorsung was initially smoking a cigarette. Officer S testified that this indicated to him that Lorsung was possibly stressed or trying to mask a "different odor." He confirmed that Lorsung was the driver and obtained her contact and insurance information. Officer S testified that in this initial interaction with Lorsung, he did not observe any indicators of impairment, including bloodshot or watery eyes, poor balance, slurred speech, or odor of alcohol. Lorsung explained that she was backing her car out of a parking space at "less than a mile [per hour]" when the collision with the pedestrian occurred. After this exchange, Officer S left Lorsung for a few minutes to help an extremely intoxicated bystander who was on the verge

3

of collapsing. When he returned to continue to collect Lorsung's information, Officer S told Lorsung that he would return shortly, and he then went to check on the pedestrian, who was being treated in an ambulance. Officer S then told Officer Y that he did not need assistance, as he was just going to "check [on Lorsung] before she leaves" and because it appeared that Lorsung was backing out when the drunken pedestrian walked into her car.

Officer S returned to Lorsung at 2:28 a.m. He asked her how much she had to drink, and she replied that she had consumed three Miller Lite beers. He then conducted a horizontal gaze nystagmus (HGN) test[1] on Lorsung. During the test, Lorsung mentioned that she had suffered a concussion three to four weeks earlier. An HGN test has six indicators, and a person is considered impaired when four or more indicators are present. Officer S observed none of the six indicators of impairment on Lorsung's initial HGN test.

After administering the initial HGN test, Officer S provided Lorsung with a case number and explained that he would need to write a "crash report." He added, "I'm [going to] have you hang on for just two more minutes until I make sure we're all good in there and then we'll get you out of here. Sound good?" At approximately 2:30 a.m., he left Lorsung to check on the pedestrian in the ambulance again and remarked to his fellow officers that he was "just [going to] wait for them to get done in the ambulance" and then they could let everyone leave.

---

[1] An HGN test evaluates for nystagmus, which is involuntary eye movement when attempting to follow a target moved side to side. *See State v. Klawitter*, 518 N.W.2d 577, 579 (Minn. 1994).

4

Officer Y allowed Lorsung to move her car back into a parking spot. Lorsung told Officer Y that she was too nervous to drive after the incident and that she had contacted her sister to pick her up. Officer Y and Lorsung then exchanged pleasantries for about five minutes. Officer Y testified that he observed no signs of impairment and that he did not think that Lorsung was impaired.

At 2:39 a.m., Officer S was back at his squad car and working on paperwork, when his sergeant approached and asked if Lorsung was "drunk." Officer S replied, "No. No HGN at all." The sergeant responded, "So a sober driver was hit by a drunk pedestrian?" to which Officer S answered, "Kind of. It seemed that way." Officer S then attempted to obtain a PBT from the pedestrian, but she declined. He then told his sergeant that he was going to "PBT [Lorsung] so they can't say I didn't do my job."

Just before Officer S reapproached, Lorsung told Officer Y that her sister had arrived to pick her up. Officer Y responded, "I won't keep you guys. Did you guys have any questions before you guys take off?" As Officer Y and Lorsung were wrapping up, Officer S returned at 2:41 a.m.—about 11 minutes after he had last spoken with Lorsung—and he requested that Lorsung perform a PBT.[2]

Lorsung declined the PBT request, stating that she was worried that her alcohol concentration would be over 0.08. She decided to take field sobriety tests instead of the

---

[2] Officer S also testified that he detected an odor of alcohol when he reapproached Lorsung. But the district court does not appear to have credited this testimony. "After a careful review of the evidence," the district court found that Lorsung "displayed no signs of impairment" before Officer S requested the PBT and that "Officer [S's] report is unsupported to some extent by the video evidence."

PBT, but Officer S made clear that he would still request a PBT after the sobriety tests. Officer S then administered a second HGN test, during which he observed signs of impairment. He next asked Lorsung to perform a walk and turn test, which also indicated impairment.

Lorsung eventually consented to a PBT and registered an alcohol concentration of 0.145—well above the legal limit of 0.08. Officer S arrested her for driving while impaired. Lorsung later took a DataMaster breath test, which indicated an alcohol concentration of 0.15. This test result led to the Commissioner's decision to revoke Lorsung's driver's license for driving while impaired under Minnesota Statutes section 169A.52, subdivision 4.

Upon reviewing the above evidence at the implied consent hearing, the district court upheld the Commissioner's revocation of Lorsung's driver's license. In its order denying Lorsung's petition, the district court weighed the totality of the circumstances to determine whether Officer S had reasonable suspicion that Lorsung was driving while impaired. The district court noted that several factors weighed in favor of reasonable suspicion:

> Petitioner had backed into a pedestrian, after bar closing time, in a bar parking lot, which required preparation of a crash report, and Petitioner had consumed alcohol earlier in the evening. Petitioner initially smoking a cigarette could have been done to mask alcohol, and Officer [S] did not need to believe Petitioner's statements about how much she had consumed or the impact of the concussion on her performance on SFSTs [standardized field sobriety tests]. The length and scope of the detention was relatively short, and not intolerable under the circumstances. Officer [S] acted diligently to process the scene and reasonably sought to verify Petitioner was not impaired before clearing the scene.

The district court also noted that other factors weighed against reasonable suspicion:

> The court agrees Petitioner displayed no signs of impairment, particularly none of the typical signs of impairment cited by law enforcement when articulating their suspicion to justify a DWI investigation. The accident was minor, and the pedestrians' intoxication appeared to be a large factor in the accident. Further, Officer [S's] report is unsupported to some extent by the video evidence, and Officer [S] mostly sought to administer the PBT to placate the pedestrians and to verify his belief Petitioner was sober, rather than based on traditional, objective indicia of impairment.

Weighing the factors favoring reasonable suspicion against the countervailing factors, the district court determined that because Lorsung had "struck a pedestrian, after bar [closing] time, in a bar parking lot, and had consumed alcohol before driving, Officer [S] had reasonable grounds to expand the stop and administer a PBT."

The court of appeals reversed. It reasoned that Officer S initially had reasonable suspicion of impairment because he knew that Lorsung "had been drinking and that she had backed into a pedestrian in the parking lot of a bar at closing time." *Lorsung v. Comm'r of Pub. Safety*, No. A24-0540, 2024 WL 5242082, at *2 (Minn. App. Dec. 30, 2024). But the court of appeals concluded that the initial reasonable suspicion was dispelled before Officer S requested the PBT by the combination of Lorsung's satisfactory HGN test and the lack of physical indications of impairment. *Id.* at *2–3. In doing so, the court of appeals particularly emphasized Lorsung's satisfactory HGN test performance, appearing to afford that fact elevated weight in the totality of the circumstances analysis. The court of appeals acknowledged that successful performance on dexterity tests does not prove a person is not impaired, but reasoned that successful performance on an HGN test is different because

7

even a "skillful, practiced drunk . . . cannot control the involuntary eye oscillation the officers are watching for during the [HGN] test." *Id.* at *3.

We granted the Commissioner's petition for further review.

**ANALYSIS**

This case centers on whether Officer S's request that Lorsung perform a PBT was supported by reasonable suspicion. A police officer may require a driver to submit to a PBT if the officer "has reason to believe from the manner in which a person is driving, operating, controlling, or acting upon departure from a motor vehicle, or has driven, operated, or controlled a motor vehicle, that the driver" may have been driving while impaired. Minn. Stat. § 169A.41, subd. 1. As relevant here, a person commits the crime of driving while impaired when they drive under the influence of alcohol, Minn. Stat. § 169A.20, subd. 1(1), or with an alcohol concentration of 0.08 or more, as measured within two hours of driving, *id.*, subd. 1(5).[3] The parties agree that a police officer can request that a driver submit to a PBT under Minnesota Statutes section 169A.41, subdivision 1, only if the request is supported by a reasonable suspicion of impaired driving.[4] Accordingly, the question before us is whether Officer S's request that Lorsung

---

[3]     Driving while impaired can be committed in other ways not relevant here. *See* Minn. Stat. § 169A.20, subd. 1(2)–(4), (6)–(8). When we refer to impairment and impaired driving in this opinion, we mean that the person had driven under the influence of alcohol or had driven with an alcohol concentration of 0.08 or higher.

[4]     In *State v. Juncewski*, we held that an officer may request a PBT if the request is supported by a "specific and articulable suspicion" to believe that a person has been driving while impaired. 308 N.W.2d 316, 321 (Minn. 1981) (applying Minn. Stat. § 169.121, subd. 6 (1980)). The statute discussed in *Juncewski*—Minnesota Statutes section 169.121,

perform the PBT was supported by a reasonable suspicion that she had driven while impaired.[5]

To answer this question, we begin with a discussion of the reasonable-suspicion standard. We then apply that standard to the facts presented here. We next address the arguments that the reasonable suspicion present here was "dispelled" before the PBT request and that the PBT request unlawfully expanded the scope of the initial stop.

---

subdivision 6 (1980)—was repealed but recodified in Chapter 169A using the same language. *See* Act of May 15, 2000, ch. 478, art. 2, § 8, 2000 Minn. Laws 1484, 1537 (codified as amended at Minn. Stat. § 169A.41, subd. 1 (2024)). In numerous opinions, the court of appeals has reasoned that *Juncewski* adopted a reasonable-suspicion standard in the context of PBT requests. *See, e.g.*, *Mesenburg v. Comm'r of Pub. Safety*, 969 N.W.2d 642, 650 (Minn. App. 2021); *State v. Sargent*, 951 N.W.2d 121, 132 (Minn. App. 2020), *rev'd and remanded on other grounds*, 968 N.W.2d 32 (Minn. 2021); *Vondrachek v. Comm'r of Pub. Safety*, 906 N.W.2d 262, 268 (Minn. App. 2017).

Although *Juncewski* framed the standard as "specific and articulable suspicion," its analysis is substantively the same as a "reasonable suspicion" analysis. *Juncewski* emphasized that the officers relied on "specific and articulable facts" to support their belief that the driver was impaired and expressly tied the standard to *State v. Cavegn*, 294 N.W.2d 717 (Minn. 1980), and *Marben v. Department of Public Safety*, 294 N.W.2d 697 (Minn. 1980), both of which applied the traditional reasonable-suspicion standard from *Terry v. Ohio*, 392 U.S. 1 (1968). *Juncewski*, 308 N.W.2d at 321 (citing *Cavegn*, 294 N.W.2d at 721–22; *Marben*, 294 N.W.2d at 699–700).

Accordingly, although we have not used the term "reasonable suspicion" in this context, and *Juncewski* itself did not use that term, *Juncewski* supports the proposition that Minnesota Statutes section 169A.41, subdivision 1, requires that a PBT request be supported by a reasonable suspicion of driving while impaired. In any event, because the parties do not dispute that the applicable standard is reasonable suspicion, we assume without deciding that reasonable suspicion is the appropriate standard here.

[5] The Commissioner has not argued that a violation of Minnesota Statutes section 169A.41, subdivision 1, is an insufficient ground on which to challenge the revocation of a driver's license. Because we ultimately hold that the PBT request was lawful under Minnesota Statutes section 169A.41, subdivision 1, we need not decide whether an unlawful PBT request is a sufficient ground on which to challenge a license revocation.

A.

Determining the existence of reasonable suspicion presents a question of fact and a question of law. *State v. Lugo*, 887 N.W.2d 476, 487 (Minn. 2016). This court reviews the district court's findings of fact for clear error. *State v. Diede*, 795 N.W.2d 836, 843 (Minn. 2011). But the district court's determination that its factual findings support reasonable suspicion is a question of law that this court reviews de novo. *See id.* Because Lorsung does not contest the district court's factual findings, we conduct a de novo review focused on whether those factual findings support reasonable suspicion. *See State v. Taylor*, 965 N.W.2d 747, 752 (Minn. 2021) (explaining that, because the appellant did not contest the facts, the issue was "purely a legal determination on given facts" and warranted de novo review (citation omitted) (internal quotation marks omitted)).

"Reasonable suspicion must be 'particularized' and based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "The actual, subjective beliefs of the officer are not the focus in evaluating reasonableness." *State v. Koppi*, 798 N.W.2d 358, 363 (Minn. 2011). Rather, we assess reasonableness through "an objective examination of the totality of the circumstances." *State v. Lemert*, 843 N.W.2d 227, 230 (Minn. 2014). In doing so, we consider the " 'whole picture.' " *Taylor*, 965 N.W.2d at 753 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 752 (citations omitted) (internal quotation marks omitted). It is a "common-sense and

10

nontechnical approach that considers the factual and practical considerations of everyday life." *Id.* (citations omitted) (internal quotation marks omitted).

Reasonable suspicion is not a high standard. *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008). The officer must provide "something more than an unarticulated hunch" and "must be able to point to something that objectively supports the suspicion at issue." *State v. Davis*, 732 N.W.2d 173, 182 (Minn. 2007) (citation omitted) (internal quotation marks omitted). Establishing reasonable suspicion requires " 'considerably less' " proof of wrongdoing than a preponderance of the evidence and " 'obviously less' " proof than needed to establish probable cause. *Taylor*, 965 N.W.2d at 753 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).

B.

We now turn to the application of the reasonable-suspicion standard to the facts presented. To assess if the reasonable-suspicion requirement was satisfied in this case, we need to determine whether, when Officer S requested the PBT, his request was supported by reasonable suspicion that Lorsung had been driving while impaired. We conclude that, considered in their totality, the undisputed facts provide an objective basis for suspecting that Lorsung had driven while impaired when Officer S requested the PBT.

Starting with the facts that support reasonable suspicion, Lorsung admitted to Officer S that she had consumed three Miller Lite beers before driving. This admission provides a strong basis to rationally infer that Lorsung had driven while impaired. And additional facts tend to reinforce the rational inference that Lorsung had driven while impaired. Although circumstances of time and location are generally not dispositive on

11

their own, they can be relevant factors to consider in a totality of the circumstances analysis.[6] Here, the incident occurred in a bar parking lot shortly after closing. Combined with other factors, this time and location contribute to a suspicion of alcohol consumption and impaired driving. And Lorsung's driving conduct itself provides additional support for reasonable suspicion. The fact that she backed into a pedestrian with her car supports a rational inference of impairment. Viewed together, Lorsung's admission to drinking alcohol, the fact that she backed into a pedestrian with her car, and the location and circumstances of the accident all support an objectively reasonable suspicion of impaired driving at the time that Officer S requested the PBT.[7]

Lorsung argues that other undisputed facts made it unreasonable to suspect impairment: (1) Officers S and Y testified that Lorsung did not present any physical indicia of impairment; (2) Lorsung exhibited no signs of impairment on the initial HGN test; (3) the officers' statements at the scene show that they did not believe Lorsung was impaired; (4) there was an approximately 11-minute gap between Officer S leaving Lorsung to attend to the rest of the scene and returning to request the PBT; and (5) the

---

[6] *See State v. Morse*, 878 N.W.2d 499, 502 (Minn. 2016) (explaining that, in addition to a driver making a wide right turn and "drifting," relevant circumstances justifying a traffic stop included "the fact that the events occurred close to 2:00 a.m. bar closing time" and that the driver "was leaving downtown, an area with bars").

[7] The district court, in its analysis, observed that "Petitioner initially smoking a cigarette could have been done to mask alcohol." Because we conclude that other factors support reasonable suspicion in this case, we need not address the impact—if any—of this factor on the totality of the circumstances.

accident itself was minor and potentially caused by the pedestrian. We address each of these factors in turn.

First, both Officers S and Y testified at the implied consent hearing that Lorsung did not show physical signs of impairment (e.g., no bloodshot eyes, watery eyes, slurred speech, or poor balance) before the PBT request. That fact certainly weighs against a reasonable suspicion that Lorsung was impaired, but it is not dispositive. We have emphasized that there is no bright-line rule requiring physical signs of impairment to establish reasonable suspicion. *Taylor*, 965 N.W.2d at 758. Although an absence of physical indications of impairment is "unusual," it is not enough to outweigh other factors contributing to a reasonable suspicion of impairment. *Id.*

Second, it is also undisputed that Lorsung did not exhibit signs of impairment on the initial HGN test. We have not before addressed the appropriate weight to accord a satisfactory HGN test in a reasonable-suspicion analysis. As noted above, an HGN test evaluates for nystagmus, which is involuntary eye movement that occurs when a person attempts to follow a target moved side to side. *State v. Klawitter*, 518 N.W.2d 577, 579 (Minn. 1994). In *Klawitter*, we held that the HGN test meets the *Frye* standard (for the admission of scientific evidence)[8] and that an HGN test may be indicative of impairment when nystagmus is present. *Id.* at 584–85. But we did not hold the inverse—that the

---

[8]    This rule comes from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), "which held that scientific evidence 'must be sufficiently established to have gained general acceptance in the particular field in which it belongs' before it will be admitted in evidence." *Klawitter*, 518 N.W.2d at 578 n.1 (quoting *Frye*, 293 F. at 1014).

*absence* of nystagmus is equivalently probative of *non-impairment*.[9]  It follows that the presence of nystagmus may provide a strong indication of impairment, but nothing in the record or our case law supports the conclusion that absence of such movement is equally probative of non-impairment.

Additionally, our previous treatment of successful dexterity tests[10] provides some guidance on how to treat a satisfactory HGN test in the context presented here.  We have held that successful performance on dexterity tests has probative value but does not have "in and of [itself], any inherent 'unimpeachable' character."  *State v. Elmourabit*, 373 N.W.2d 290, 293 (Minn. 1985).  Instead, "[n]egative dexterity test results simply [are] one of many items of evidence to be weighed."  *Id.*  Although *Elmourabit* was focused on a different question—whether we should reverse a guilty verdict based on evidence that the defendant had passed dexterity tests—the case is still instructive here due to its extensive reasoning.[11]  *See id.* at 292.  For these reasons, we conclude that Lorsung's

---

[9]  We noted in *Klawitter* that "[none of the experts] contended, however, that the presence or absence of nystagmus is determinative of the presence of drugs but only that nystagmus, *when it is present*, may be an element supportive of a conclusion of drug impairment."  518 N.W.2d at 585 (emphasis added).

[10]  We have described "dexterity tests" in this context as "consisting of walking a line, walking heel to toe, and standing on one foot while leaning back with eyes closed."  *State v. Elmourabit*, 373 N.W.2d 290, 291 (Minn. 1985).

[11]  We reasoned in *Elmourabit* that "[i]t is not uncommon for a person under the influence of liquor, where judgment or reflexes have been impaired, to nevertheless be able to perform the tests satisfactorily."  373 N.W.2d at 292.  We relied on *State v. Graham*, 222 N.W. 909 (Minn. 1929), where we acknowledged that " '[a]lthough he can walk straight, although he may attend to his business and may not give any outward and visible signs to the casual observer that he is drunk,' a person may still be under the influence."

satisfactory HGN test performance is not dispositive of non-impairment but is an additional factor that weighs against reasonable suspicion of her impairment.

Third, we consider the statements of Officers S and Y at the scene indicating that they did not believe Lorsung to be impaired. To be clear, we have held that the existence of reasonable suspicion "is not based on the subjective beliefs of the officer." *Taylor*, 965 N.W.2d at 755 n.5. This means that evidence of an officer's subjective beliefs *supporting* suspicion should not be considered in the totality of the circumstances. *See id.*; *Lemert*, 843 N.W.2d at 230–31. But it is less clear whether we must disregard evidence of an officer's belief that *no* crime has occurred.[12] That said, we need not resolve this question

_____

373 N.W.2d at 292 (quoting *Graham*, 222 N.W. at 911). We also cited a treatise explaining that an intoxicated person " 'may not appear drunk and, in fact, may handle self and vehicle quite well.' " *Id.* (quoting Richard S. Frase, Phebe S. Haugen & Martin J. Costello, *Minnesota Misdemeanors and Moving Traffic Violations* 459 (1984)). Finally, we emphasized that dexterity tests are not dispositive of non-impairment by citing a case in which the defendant had a 0.13 alcohol concentration and nonetheless passed three field sobriety tests. *Id.* at 293 (citing *Swapinski v. Comm'r of Pub. Safety*, 368 N.W.2d 322 (Minn. App. 1985)). Accordingly, although *Elmourabit* was decided under a different standard, its reasoning is relevant to the question presented here.

[12]    Although we need not address the question in this case, it is an open question whether this court must disregard an officer's subjective belief that no crime has occurred. It is true that we have stated that "[t]he actual, subjective beliefs of the officer are not the focus in evaluating reasonableness." *Koppi*, 798 N.W.2d at 363. But we have also explained that evidence of an officer's lack of subjective suspicion is "noteworthy" to an analysis of the reasonableness of a search or seizure, based on the totality of the circumstances. *State v. Askerooth*, 681 N.W.2d 353, 369 n. 12 (Minn. 2004) ("While not dispositive to our objective evaluation, the absence of any subjective perception of risk by [the officer] is *noteworthy*." (emphasis added)). The rationale for excluding evidence of subjective beliefs from the reasonable-suspicion analysis is not because they are irrelevant, but because "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *State v. Britton*, 604 N.W.2d 84,

15

here, because the Commissioner agreed at oral argument that the officers' statements were relevant to the reasonable suspicion assessment to the extent that such statements shed light on what an objective officer would suspect given the circumstances before them. For this reason, and for the purposes of this case, we assume without deciding that the officers' statements are additional, objective non-dispositive factors cutting against reasonable suspicion of Lorsung's impairment. The statements at the scene show that they did not believe that Lorsung was impaired. Officer S's statements indicate that he sought to administer the PBT to placate the pedestrian involved in the accident and others at the scene and confirm his belief of Lorsung's non-impairment. Lorsung also emphasizes that Officer S gave her case information (an indication that he was wrapping up his investigation), that Officer Y permitted her to move her car (an indication that he was not concerned about her driving the car in an impaired state), and that Officer Y indicated she was free to leave. Given our assumption in this case that the officers' statements should be considered in the totality of the circumstances, we agree with Lorsung that these statements cut against reasonable suspicion of impairment.

---

88 (Minn. 2000) (quoting *Terry*, 392 U.S. at 22). The objective standard therefore serves as a safeguard by requiring an evidentiary floor, preventing officers from justifying intrusions based on their subjective beliefs or hunches.

Given this rationale, whether we should disregard an officer's statement *disclaiming* suspicion remains an open question. But we need not resolve that question in this case because the parties agree that the officers' statements are additional, objective non-dispositive factors cutting against reasonable suspicion of Lorsung's impairment. We express no view as to how an officer's subjective statement disclaiming suspicion of criminal activity otherwise impacts the reasonable-suspicion analysis.

Fourth, Lorsung emphasizes the 11-minute period during which Officer S left Lorsung to attend to the rest of the scene, after which he returned to request the PBT. In those 11 minutes, Officer S coordinated with the ambulance to have the pedestrian transported to the hospital and worked on paperwork related to the incident. Given that Officer S's 11-minute absence is explained by reasons that do not undercut a reasonable suspicion of Lorsung's impairment, we do not give significant weight to that brief delay.

Fifth, Lorsung argues that the minor nature of the accident and the pedestrian's impairment weigh against a reasonable suspicion of her impairment. These factors are relatively insignificant. Although the pedestrian may have shared fault for the accident, as discussed above, Lorsung's apparent collision with a pedestrian nonetheless supports a rational inference of impairment.

Ultimately, "no one silver bullet exists" to determine reasonable suspicion of impairment. *Taylor*, 965 N.W.2d at 758. Each case must be evaluated under the totality of the circumstances and the rational inferences drawn from the particular facts. *See Davis*, 732 N.W.2d at 182. Here, although it is undeniable that several circumstances diminish a reasonable suspicion of impairment, those circumstances do not eliminate or overcome the strong inference of impairment supported by other circumstances. Reasonable suspicion is a "low hurdle." *Taylor*, 965 N.W.2d at 757. Lorsung admitted to drinking three beers and then driving, and that admission—combined with the fact that she backed into a pedestrian with her car in a bar parking lot just after closing time—provides more than an "unarticulated hunch" that Lorsung had been driving while impaired. *See Davis*, 732 N.W.2d. at 182 (citation omitted) (internal quotation marks omitted). Viewed in their

17

totality, and in light of the low standard for reasonable suspicion, the facts presented in this case provide a particularized and objective basis for suspecting that Lorsung was driving while impaired.

C.

We next address the reasoning advanced by Lorsung and the court of appeals supporting a conclusion that reasonable suspicion was "dispelled" at the time that Officer S requested the PBT. We are unpersuaded that reasonable suspicion was dispelled.

We have recognized that reasonable suspicion can be dispelled only in limited circumstances. In *State v. Pike*, for example, we explained that although an officer would have reasonable suspicion that a crime had been committed by the driver of a car owned by someone with a suspended license, that reasonable suspicion would be dispelled upon the officer learning that the driver was not the owner of the car. 551 N.W.2d 919, 922 (Minn. 1996). Relying on *Pike*, we concluded in *State v. Britton* that a police officer's reasonable suspicion that a car was stolen was *not* dispelled when a computer check of the car indicated the car was not stolen, because the officer testified to his knowledge that the stolen vehicle database was not always correct. 604 N.W.2d 84, 88 (Minn. 2000). The analysis in *Pike* and reiterated in *Britton* shows that the standard for a court to conclude that reasonable suspicion has been dispelled by new information is a high one: New information dispels reasonable suspicion only when it conclusively negates the basis for the reasonable suspicion. This stringent requirement for dispelling reasonable suspicion is sensible for at least two reasons. First, we have made clear that reasonable suspicion is a "low hurdle." *Taylor*, 965 N.W.2d at 757. Second, we assess reasonable suspicion under

18

the *totality* of the circumstances, *id.* at 758, and it follows that it should be relatively rare for a single circumstance to outweigh all others.

Here, there is no basis for concluding that reasonable suspicion was dispelled before the PBT request. Although Lorsung argues that multiple factors had dispelled reasonable suspicion before the PBT request,[13] none of those factors conclusively negate the basis for reasonable suspicion—Lorsung's admission to drinking three beers and backing into a pedestrian with her car in a bar parking lot at closing time.[14]

The reasoning set forth by the court of appeals also falls short of the stringent standard for dispelling reasonable suspicion. The court of appeals afforded Lorsung's initial satisfactory HGN test elevated weight in the totality of the circumstances and accordingly held that reasonable suspicion had been dispelled before the PBT request.[15]

---

[13]    Lorsung notes that she passed the initial HGN test; she exhibited no signs of physical impairment; Officer S gave her the case information; and Officer S left her for 11 minutes to check on the scene before he returned to request the PBT.

[14]    Lorsung also argues that reasonable suspicion can be dispelled when an officer determines that the person is free to leave, relying on *State v. Horn*, No. A17-1276, 2018 WL 2770465 (Minn. App. June 11, 2018), a non-precedential court of appeals case. But Lorsung failed to make this argument at the district court, and the district court did not consider it. "A reviewing court must generally consider only those issues that the record shows were presented and considered by the trial court." *Steward v. State*, 950 N.W.2d 750, 756 (Minn. 2020) (citation omitted) (internal quotation marks omitted). Because Lorsung did not raise this argument until her appeal, she forfeited it. *See State v. Myhre*, 875 N.W.2d 799, 806 (Minn. 2016).

[15]    The Commissioner asserts that the court of appeals created a "single-factor" test based upon a satisfactory HGN test. The court of appeals used some language that lends support to this reading. *See Lorsung*, 2024 WL 5242082, at *3 ("[A]lthough a skillful, practiced drunk might mask her intoxication by outperforming her impaired peers in a dexterity test, she cannot control the involuntary eye oscillation the officers are watching

The court of appeals distinguished an HGN test from dexterity tests, suggesting that a satisfactory performance on an HGN test proves non-impairment. To make this distinction, the court of appeals relied on our description of an HGN test as measuring " 'the rapid involuntary horizontal oscillation of the eyes' " that may result from alcohol consumption. *Lorsung*, 2024 WL 5242082, at *3 (quoting *Klawitter*, 518 N.W.2d at 579). The court of appeals reasoned that "although a skillful, practiced drunk might mask her intoxication by outperforming her impaired peers in a dexterity test, she cannot control the involuntary eye oscillation the officers are watching for during the [HGN] test." *Id.*

As explained above, *Klawitter* held only that an HGN test may be indicative of impairment when there is involuntary eye oscillation, not that the *absence* of such oscillation is probative of *non-impairment*. We find nothing in the record here or our case law that supports the conclusion that absence of such movement is equally probative of non-impairment. Further, the facts in the record underscore why a satisfactory HGN test should not be afforded elevated weight: Lorsung herself failed a second HGN test shortly after she passed the first one, failed a walk-and-turn test, and ultimately registered a 0.15 alcohol concentration on the DataMaster breath test, well above the legal limit.

---

for during the [HGN] test."). On the other hand, it is also possible—as we do above—to understand the court of appeals as treating a satisfactory HGN test as a factor afforded elevated weight in the totality of the circumstances that dispels reasonable suspicion in conjunction with other factors indicating non-impairment. *See id.* at *2 (noting that although Officer S initially had reasonable suspicion that Lorsung was impaired, her satisfactory HGN test performance "combined with the accident investigation and [Officer S's] ongoing observations of Lorsung" led Officer S to believe that she was sober). Because we reject even this latter interpretation and conclude that a satisfactory HGN test should not be afforded elevated weight, we need not otherwise address the Commissioner's more extreme "single-factor" interpretation.

For these reasons, we decline to adopt the approach of the court of appeals and conclude that Lorsung's satisfactory HGN test should not be afforded elevated weight in the totality of the circumstances. Instead, we treat Lorsung's satisfactory HGN test as an ordinary factor that diminishes but ultimately does not dispel the reasonable suspicion that Lorsung was driving while impaired.

D.

In addition to arguing that Officer S lacked reasonable suspicion when he requested the PBT, Lorsung also argues that the PBT request was an unlawful expansion of the scope of the stop.[16] Lorsung's argument arises from our application of *Terry* principles to traffic stops under the Minnesota Constitution, as explained in *State v. Askerooth*, 681 N.W.2d 353, 364 (Minn. 2004) (citing *Terry*, 392 U.S. at 19–20). Our *Askerooth* analysis involves a two-step inquiry. In the first step, we ask whether the stop was justified at its inception by reasonable suspicion. *Id.* at 364. If reasonable suspicion justified the initial stop, we turn to the second step and ask whether " 'the actions of the police during the stop were reasonably related to and justified by the circumstances that gave rise to the stop in the first place.' " *Diede*, 795 N.W.2d at 842 (quoting *Askerooth*, 681 N.W.2d at 364). An action not closely related to the initial justification is an expansion of the stop, and—as relevant here—an expansion is unlawful unless it is "justified by a reasonable articulable suspicion

---

[16] Although Lorsung had argued in her brief that the PBT request was an unlawful expansion in the scope *and duration* of the stop, at oral argument her counsel clarified that Lorsung is *not* arguing that the duration of the stop resulted in an expansion of the stop. Accordingly, because Lorsung abandoned this argument at oral argument, we need not address whether the 11-minute gap was intolerably long.

21

of other criminal activity." *See State v. Sargent*, 968 N.W.2d 32, 39 (Minn. 2021) (citation omitted) (internal quotation marks omitted).

Regarding the first step, Lorsung does not argue that the stop was unlawful and instead concedes that Officer S initially had reasonable suspicion that Lorsung had driven while impaired.

As for the second step, we do not agree with Lorsung that Officer S's PBT request was an unlawful expansion of the scope of the stop. The PBT request was not an expansion because it was "reasonably related to and justified by the circumstances that gave rise to the stop in the first place." *Diede*, 795 N.W.2d at 842 (citation omitted) (internal quotation marks omitted). Here, the justification for the stop was a car-pedestrian accident in a bar parking lot after 2:00 a.m. involving a driver who had been drinking alcohol. In light of those circumstances and our conclusion above that reasonable suspicion had not been dispelled, Officer S's request that Lorsung—the driver who had admitted to drinking—perform a PBT was reasonably related to his original purpose of investigating an accident involving alcohol. *See id.* Accordingly, because the PBT request was reasonably related to and justified by the circumstances of the initial stop, we reject Lorsung's argument that the PBT request was an expansion of the stop requiring independent reasonable suspicion.

\* \* \*

Reasonable suspicion is a "low hurdle." *Taylor*, 965 N.W.2d at 757. Before Officer S requested the PBT, Lorsung admitted to drinking three beers and backing her car into a pedestrian in a bar parking lot at closing time. Although there were other facts and inferences that weighed against Lorsung's impairment—such as Lorsung's lack of physical

22

indicia of impairment, her satisfactory HGN test performance, and the officer's statements indicating they did not believe she was drunk—we hold that those factors do not bring the totality of the circumstances below the "low hurdle" of reasonable suspicion. Nor do any of those factors conclusively negate the basis for reasonable suspicion of impairment as is required for reasonable suspicion to be dispelled. Accordingly, the district court did not err when it denied Lorsung's petition to rescind her license revocation, and the court of appeals erred in its reversal.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals.

Reversed.